E. Nadine RODGERS, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16020.

United States Court of Appeals
Ninth Circuit.

May 11, 1959.

Thomas H. Ludlow, Jr., Los Angeles, Cal., Harry D. Steward, San Diego, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Leila F. Bulgrin, Robert John Jensen, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before CHAMBERS, BARNES and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

Appellant appeals from the judgment of the district court, sitting without a jury, a jury having been expressly waived in writing and in open court by the appellant, finding her guilty of the offense [1] of illegal importation of narcotics and sentencing her to custody for five years.

We will first outline the history of the proceedings leading up to the judgment from which appellant appeals in order to properly posture the grounds on which appellant relies for reversal.

There is no claim by appellant that she did not illegally import narcotics from the Republic of Mexico to the United States. Included in the written stipulation filed with the district court, to which further reference hereafter appears, is the following: "It is hereby further stipulated by and between the parties that on October 11, 1957, Nadine E. Rodgers brought into the United States from Mexico the powder contained in two rubber contraceptives that were later that day found in her possession at San Diego; that upon analysis said powder was found to be and is heroin; that said heroin is the same evidence that defendants sought to suppress at the hearing of December 23 and 24 of 1957."

Appellant contends on this appeal that her conviction was illegal for the reasons and on the grounds which we will consider in the latter part of this opinion.

### History of Proceedings.

Following the arrest of the appellant and her husband, Evan W. Rodgers, here-in referred to as Rodgers,[2] and on November 12, 1957 appellant and her husband lodged a civil action in the district court, entitled "Complaint to Suppress and for Preliminary Restraining Order and Injunction." On the same day appellant's counsel requested from the court an ex parte order to restrain the defendants in the civil action from presenting evidence to the grand jury, on the ground that the heroin obtained from appellant was by a search incident to an unlawful arrest. The district court refused to grant any restraining order and refused to stay the criminal proceedings pending the determination by this Court. See Rodgers v. United States, D.C., 158 F. Supp. 670. After disposition of the matter by the district court, appellant and her husband sought writs of mandamus and prohibition from this Court. The petitions were denied by this Court. See Rodgers v. United States, supra, 158 F. Supp. at page 684.

Indictment by the grand jury was returned against appellant and her husband on November 14, 1957.

Thereafter appellant and her husband moved the district court to suppress the seized evidence under the provisions of Rule 41(e) (4), Federal Rules of Criminal Procedure, Title 18 U.S.C.A. Following the hearing, the motion was denied by the district court.

Thereafter by the written stipulation filed in the district court, and previously referred to, it was stipulated and agreed, among other things, "that the evidence introduced on hearing of the motion by defendants to suppress certain evidence (heroin) which was found in the possession of Nadine E. Rodgers, made in the above-entitled cause and heard by the Court on December 23 and 24 of 1957, may be heard and considered by the Court as evidence on trial of the merits of the above-entitled cause having the same weight and sufficiency as though introduced anew." On March 10,

---

1. Section 174, as amended July 18, 1956, Title 21 U.S.C.A.

2. After the hearing on the motion to suppress evidence Rodgers died from ac-cidental causes, and for that reason the case was dismissed as to him on March 3, 1958.

1958, the district court adjudged the defendant guilty of the offense set forth in the indictment.

### Appellant's Appeal.

Appellant seeks reversal of the judgment of the district court primarily on two grounds: First, that the narcotics seized from her should have been suppressed, because, appellant contends, the narcotics were obtained by a search made incident to an unlawful arrest; and, second, that the trial court prejudicially erred in refusing appellant's counsel permission to inspect certain government reports from which a government agent testified at the hearing on the motion to suppress the evidence.

In respect to the first ground, appellant contends that the arresting officer, though acting in personal good faith, did not have probable cause to arrest appellant without a warrant, and that appellant's motion to suppress the evidence should have been granted by the trial court for the reason that such evidence was obtained by a search made incident to an unlawful arrest, in violation of the rights guaranteed appellant under the Fourth Amendment of the Constitution of the United States,[3] and in violation of Section 7607, Title 26 U.S.C.A. of the Narcotic Control Act of 1956.[4]

In order to properly consider appellant's contention it is necessary that we set out in detail the essential facts adduced at the hearing on appellant's motion to suppress evidence. At about 3:00 p. m. on October 11, 1957, appellant's husband and Gilbert Martinez (hereinafter referred to as Martinez), traveling together by automobile, entered the United States from Mexico at the port of entry at San Ysidro, California. After preliminary questioning by the customs inspectors at the border, they were taken to the secondary inspection area for further inspection and interrogation, on the possibility that Rodgers might be guilty of failure to register as a former narcotics violator. A search of Rodgers' car revealed a suitcase containing women's clothing and a document concerning the sale of real estate. Rodgers had on his person a cashier's check for $2,000. At about 4:00 p. m. that same afternoon United States Customs Agent Clarence Spohr arrived at the inspection station and began to interrogate Rodgers. According to Spohr, Rodgers told him that in 1952 he had been convicted of a conspiracy to violate the narcotics laws in San Francisco, for which he had been sentenced to what Spohr thought was three years; that he was a thoroughbred horse trainer, that he and his wife, the appellant here, in company with Mr. and Mrs. Martinez had come south from San Francisco on a trip; that he and Gilbert Martinez left their wives in Los Angeles, and with a Mexican lad named Manuel drove to Tijuana in order that Rodgers could visit friends at a racetrack; that while in Mexico Manuel had "cut out" and he didn't know what had happened to him; that he had not found anyone he knew at the racetrack and was returning with Martinez to the United States when he was detained at the border.

After completing his interrogation of Rodgers, Spohr began interviewing Mar-

---

3. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.Const. Amend. IV.

4. 70 Stat. 570, adding Section 7607 to Title 26 of U.S.C. The section provides in pertinent part:

"The Commissioner * * * and officers of the customs (as defined in section 401(1) of the Tariff Act of 1930, as amended; 19 U.S.C., sec. 1401(1)), may—

\* \* \* \* \*

"(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs (as defined in section 4731) or marihuana (as defined in section 4761) where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

tinez. It was then approximately 4:30 or 5:00 o'clock of the same afternoon, approximately one and a half to two hours after Martinez had been placed in custody. Martinez told Spohr that he was out on bail on a pending charge for the illegal possession of narcotics under California law, and that his latest and last injection of heroin had been three days before. Agent Spohr, an experienced customs agent, observed the hypodermic marks of a heroin addict on Martinez' arm. Martinez said that he was an informant for the Federal Bureau of Narcotics in San Francisco, and he named several federal agents with whom he said he had worked. Spohr recognized the names as those of agents he personally knew were working in the San Francisco area. After Martinez had been with Spohr a little over two hours he offered to tell the agent about Mr. and Mrs. Rodgers if the agent promised that he and his wife would not be prosecuted in connection with anything that he might tell him. Spohr replied that he was quite positive that the United States Attorney would go along with anything along those lines, and use Martinez and his wife as prosecution witnesses against the Rodgers. With this assurance, Martinez then told the following story: Martinez, his wife, appellant, Rodgers, and one Manuel Garcia, a cousin of Martinez, left San Francisco together on October 6, 1957. The object of the trip was to purchase heroin from a man named "Red" whom Manuel Garcia had described to Rodgers and Martinez as his connection from whom they could make the purchase. The entire group arrived in Tijuana on October 7, 1957, where Garcia bought some heroin from "Red". Rodgers, however, did not purchase narcotics at that time because he had no ready cash, but he did have in his possession a check for $3,200, which he had received as part payment for the sale of some real estate. All five persons then returned to the United States and proceeded to Los Angeles where Rodgers cashed his check, receiving a check of $2,000 and some cash in return. Garcia

represented to Rodgers that he could purchase heroin in Los Angeles, thereby obviating the necessity of a return trip to Tijuana. Rodgers gave him $600 to make the purchase, whereupon Garcia disappeared with the money. On October 9, 1957, Rodgers, appellant, Martinez and his wife returned to Tijuana. Rodgers contacted "Red" and purchased two contraceptives full of heroin. On October 11, 1957, appellant with the heroin on her person and Mrs. Martinez were to return to the United States at about 1:00 p. m., passing through the port of entry at San Ysidro on foot. The women were then to travel by bus to San Diego and wait at the Greyhound bus depot until the men arrived in the automobile. Martinez told Agent Spohr that the two women would probably be at the Greyhound bus depot in San Diego where he and Rodgers were to meet them, and that Mrs. Rodgers would have the two pieces of heroin purchased in Tijuana on her person. Agent Spohr testified that he had never seen either Martinez or Rodgers prior to their interrogation and that he did not check any file or any report on Rodgers except to call the San Diego Police Department. From this he learned only that the department had a record of a minor infraction of the law by Rodgers. During his conversation with Rodgers, the agent apparently also attempted to verify the 1952 conviction with a telephone call to a State narcotics agent in San Diego. However, the record is inconclusive as to whether he received any information from this source.

Without questioning Rodgers about any of the allegations made by Martinez, and without attempting to secure a warrant for the arrest of the women, Spohr and Customs Agent Walter Gates, who had joined Spohr during his interrogation of Martinez, left for San Diego at about 6:00 p. m. on the same evening. Gates took Rodgers from San Ysidro to the San Diego police station where he was booked for failure to register as a prior narcotics convict. Agent Spohr and Martinez drove to the Greyhound bus depot at San Diego where Martinez

had promised to point out his wife and appellant to the officer. When Agent Gates joined them at about 6:45 p. m. in the Greyhound bus depot parking lot, the three men walked into the depot with the two agents trailing Martinez. Martinez did not locate the women in the bus station. Instead, as he looked through a doorway from the station into an adjoining restaurant, he advised the officers that the women were at a table. Preceding the two officers, Martinez entered the coffee shop, and, as prearranged with the agents, identified his wife for them by approaching and embracing her. At this point the two agents approached the table and Agent Gates went through a prearranged sham arrest of Martinez. Agent Spohr identified himself to the women by showing his commission as a United States Customs Agent, and asked their names. Both responded with their correct names. Spohr then informed them that they would have to accompany him. The women immediately submitted to this request and began to get out of the booth to leave with the agents. Agent Gates noticed in their possession a shopping bag of the type known by him to be commonly sold in Mexico. As they were leaving the booth one of the women (Agent Gates was not sure which one) in response to his question stated that they had just returned from Mexico and had there purchased a straw hat and a pair of shoes. After the check was paid, and on the way out the door, appellant asked, "Well, where are we going?" Agent Spohr replied, "You are going to the San Diego city jail. You are under arrest."

At the San Diego city jail Agent Gates kept Martinez in the booking office, while Agent Spohr escorted appellant and Mrs. Martinez towards the female detention quarters. As they walked down the corridor, Agent Spohr saw that appellant held a Kleenex in her left hand and was

concealing it against her skirt. He said, "What have you got in your hand?" Mrs. Rodgers showed him the Kleenex without protest. In the Kleenex was a rubber contraceptive which contained a white substance similar to heroin. Agent Spohr then said, "Where is the rest of it?" Mrs. Rodgers reached into her brassiere and produced another folded Kleenex which also held a rubber contraceptive containing a white powder like heroin. Mrs. Rodgers' only words were, "That's all I got."

■ The crucial question for us then is whether knowledge of the related facts and circumstances gave the customs agent "probable cause" within the meaning of the Fourth Amendment, and "reasonable grounds" within the meaning of said Section 7607,[5] to believe the appellant had committed or was committing a violation of the narcotics laws. If he did, the arrest, though without a warrant, was lawful and the subsequent seizure of the heroin from the person of the appellant was validly made incident to a lawful arrest, and therefore the motion to suppress was properly overruled and the existence of the heroin on the person of the appellant was properly considered by the court in its determination of the appellant's guilt. Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652; Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 69 L.Ed. 543; Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145; Giordenello v. United States, 357 U.S. 480, 483, 78 S.Ct. 1245, 2 L.Ed.2d 1503; Draper v. United States, supra, 358 U.S. 307, 311, 79 S.Ct. 329, 3 L.Ed.2d 327.

■ "In dealing with probable cause * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of

---

5. "The terms 'probable cause' as used in the Fourth Amendment and 'reasonable grounds' as used in § 104(a) of the Narcotics Control Act, 70 Stat. 570, are substantial equivalents of the same meaning. United States v. Walker, 7 Cir., 246 F.2d 519, 526; cf. United States v. Bianco, 3 Cir., 189 F.2d 716, 720." Draper v. United States, 1959, 358 U.S. 307, 310, 79 S.Ct. 329, 331, 3 L.Ed.2d 327.

proof is accordingly correlative to what must be proved.

" 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' McCarthy v. De Armit, 99 Pa. 63, 69, quoted with approval in the Carroll opinion. 267 U.S. at page 161, 45 S.Ct. at page 288. And this 'means less than evidence which would justify condemnation' or conviction, as Marshall, C. J., said for the Court more than a century ago in Locke v. United States, 7 Cranch. 339, 348, 3 L. Ed. 364. Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543." Brinegar v. United States, 1949, 338 U. S. 160, 175–176, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879.[6]

 While it is, of course, true that the existence of reasonable grounds to arrest without a warrant will turn upon all the facts of each individual case, it is nevertheless possible to draw certain conclusions from the cases relating to this subject. The courts have no trouble in finding reasonable cause where the arresting officer has personal knowledge leading him to believe that a crime has been committed, whether from his own observation and knowledge[7] or where the search is incident to a customs inspection.[8] However, where the arresting agents rely on an informer the question becomes more difficult. When the information from the informer is combined with the arresting officer's personal knowledge and observation of the defendant,[9] or where the arresting officer, though without personal knowledge or observation, knows or has reasonable grounds to believe that an informer is reliable,[10] the courts have found that there was reasonable grounds on which to make a valid arrest. However, where the officer makes an arrest without any knowledge of the commission of a crime except from an informer whom he does not know to be reliable, the courts have consistently held there is no reasonable grounds for the arrest.[11]

6: To the same effect are Husty v. United States. 1931, 282 U.S. 694, 700–701, 51 S.Ct. 240, 75 L.Ed. 629; Dumbra v. United States, 1925, 268 U.S. 435, 441, 45 S.Ct. 546, 69 L.Ed. 1032; Steele v. United States No. 1, 1925, 267 U.S. 498, 504, 505, 45 S.Ct. 414, 69 L.Ed. 757.

7. Brinegar v. United States, supra, 338 U.S. 160, 162–163, 69 S.Ct. 1302, 93 L. Ed. 1879; Dumbra v. United States, supra, 268 U.S. at pages 440–441, 45 S. Ct. at page 548; Carroll v. United States, supra, 267 U.S. at pages 160–161, 45 S. Ct. at pages 288–289; Steele v. United States, supra, No. 1, 267 U.S. at pages 504–505, 45 S.Ct. at pages 416–417.

8. Blackford v. United States, 1957, 9 Cir., 247 F.2d 745, 749.

9. Husty v. United States, supra, 282 U.S. at page 701, 51 S.Ct. at page 241; Hamer v. United States, 9 Cir., 1958, 259 F.2d 274, 282, certiorari denied 359 U.S. 916, 79 S.Ct. 592, 3 L.Ed.2d 577; Sandez v. United States, 9 Cir., 1956, 239 F.2d 239, 242; Washington v. United States, D.C.

Cir.1959, 263 F.2d 742, 744; United States v. Kancso, 2 Cir., 1958, 252 F.2d 220, 222; United States v. Volkell, 2 Cir., 1958, 251 F.2d 333, 336, certiorari denied 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1068; Christensen v. United States, D.C. Cir., 1958, 259 F.2d 192, 193; Shepherd v. United States, 1957, 100 U.S.App.D.C. 302, 244 F.2d 750, 753, reversed on other grounds 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332; Lee v. United States, 1954, 95 U.S.App.D.C. 156, 221 F. 2d 29, 30.

10. Draper v. United States, supra, 358 U.S. at pages 313–314, 79 S.Ct. at page 333; United States v. Garnes, 2 Cir., 1958, 258 F.2d 530, 532; United States v. Walker, 7 Cir., 1957, 246 F.2d 519, 525–526; United States v. Li Fat Tong 2 Cir., 1945, 152 F.2d 650, 652.

11. Cervantes v. United States, 9 Cir., 1959, 263 F.2d 800, 804; Hobson v. United States, 8 Cir., 1955, 226 F.2d 890, 894; Wrightson v. United States, 1955, 95 U.S.App.D.C. 390, 222 F.2d 556, 557; Contee v. United States, 1954, 94 U.S.

Here the arresting officers admittedly knew nothing of the appellant or her alleged possession of narcotics at the time they arrested her except from the information which they had received from the informer, Martinez—a man known to them only for a few hours before the arrest and whose reliability they knew only to the extent they were able to corroborate certain things he had told them before the arrest was made. This case then falls into the category of those where the arresting officers, without personal knowledge of the defendant and without observation or knowledge of his activities which could be of a criminal nature, rely entirely upon an informer to make their arrest. In such circumstances the officers must have some reasonable grounds to believe that their informer is reliable before they actually make the arrest. Draper v. United States, supra, 358 U.S. at page 313, 79 S.Ct. at page 333.

Appellant argues that since the reliability of Martinez was completely unknown by the agents at the time they undertook to question him, his tip alone was insufficient to constitute reasonable grounds for an arrest, and that what little corroboration the agents were able to make of Martinez' story before the arrest was not sufficient to afford a reasonable belief in his reliability.

The government, on the other hand, argues, that the surrounding circumstances tended to corroborate the statement of Martinez and that by the time they made the arrest the officers had sufficient information to warrant a reasonably discreet and prudent man to believe that an offense had been committed by appellant, thus justifying the arrest. In support of its argument that the agents could reasonably rely on the word of Martinez, the government points out that the marks on his arm confirmed that he was a heroin user, as he told them he was; that Agent Spohr knew the names of the Federal Bureau of Narcotics

agents whom Martinez said he had worked with in San Francisco; that the suitcase found in Rodgers' automobile containing women's clothes supported Martinez' statement that the women had gone with Martinez and Rodgers to Tijuana; and finally and most important, appellant was in San Diego near where Martinez said she would be, and not in Los Angeles where her husband said she would be. In addition to this corroborative evidence, the government points out that the agents could observe the demeanor of their informer, particularly in light of apprehension for his own plight and that of his wife as narcotics violators; that with this in mind Martinez would certainly have avoided giving false information for fear of making his position worse, and the agents could also take into consideration the fact that, in the role of an eyewitness to the events, Martinez had told a full and comprehensive story of an entire narcotics transaction.

The government further seeks to buttress Martinez' reliability by arguing that because Martinez had no opportunity to get together with Rodgers on his story it was further proof that Martinez was telling the truth when the things he said agreed with the things that the agents had already learned from Rodgers. However, there is nothing in the record to indicate that Rodgers and Martinez did not get together on their story. Here the government is assuming something not in the record, and any conclusions drawn from such an assumption cannot be considered in support of the trial court's action in denying the motion to suppress the evidence.

Appellant offers an explanation for each of the government's claimed items of corroboration the suitcase full of women's clothes did not necessarily mean that the women accompanied Martinez and Rodgers to Tijuana, and that the women could just as easily have left the suitcases in the car while they stayed in

App.D.C. 297, 215 F.2d 324, 327; Worthington v. United States, 6 Cir., 1948, 166 F.2d 557, 565. See also Hanna v. United States, D.C.Cir.1958, 260 F.2d 723, 724–725.

Los Angeles; that merely because a person happens to know the names of federal narcotics agents in the city where he lives does not necessarily mean that he is trustworthy; that the $2,000 check in Rodgers' possession might be reasonably explained by the legal papers found in Rodgers' suitcase relating to his participation in a real estate transaction, and that the check would not necessarily indicate that he was or would become involved in narcotics transactions; the fact that Martinez and Rodgers admitted having used or been connected with narcotics in no way indicated appellant's participation; and likewise the fact that appellant happened to be in a public restaurant where Martinez said she would be in no way indicated her involvement.

■ It is quite true that the interpretations by which the appellant seeks to explain the facts which the officers had before them appear reasonable. However, in determining whether or not these facts establish probable cause depends only upon whether the inferences which the agents drew from them are reasonable. While the standards imposed to determine probable cause for arrest seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime, "they also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duty are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

"The troublesome line posed by [the cases] is one between mere suspicion and probable cause. That line necessarily must be drawn by an act of judgment formed in the light of the particular situation and with account taken of all the circumstances." Brinegar v. United States, supra, 338 U.S. at page 176, 69 S.Ct. at page 1311.

Here it is true, as appellant points out, that prior to the time of the arrival at San Ysidro the agents had never seen or heard of either Martinez, Rodgers or the appellant. They had received no advance tip that Rodgers or Martinez was engaged in smuggling activity. The agents did not check any file or reports on Rodgers, nor, with the exception of a telephone call to the San Diego police which revealed a minor infraction of the law by Rodgers, did they make any outside inquiry as to his reputation or character, nor did they seek in any way the assistance of the San Francisco narcotics agents in determining Martinez' reliability, even though Martinez told Spohr he had dealt with the San Francisco agents, and finally, the agents after receiving a conflicting story from Martinez did not bother to permit Rodgers to explain it in any way. Still, taking into consideration all these facts, the basic circumstances remain. Here were United States Customs agents charged with the responsibility of checking persons passing through the Mexico-California border, known to be one of the major centers for the importation of narcotic drugs into the United States, Blackford v. United States, supra, 247 F.2d at page 752, knowing that they were dealing with persons who admitted they had been or were involved in narcotics violations, who they could assume, like most narcotics offenders, would be recidivistic and then engaged in a course of repetitious behavior. Reyes v. United States, 9 Cir., 1958, 258 F.2d 774, 785. It might well be that until the appellant had identified herself as the person accused by Martinez of having narcotics concealed on her the agents did not have the requisite reasonable grounds, but from that moment on they knew that contrary to her husband's statement the appellant was there in San Diego where Martinez had said she would

be. True she was not in the bus station where Martinez had expected to find her, but she was in an adjoining restaurant. Upon her identification the important thing in the minds of the arresting officers was that here was the wife of an admitted narcotics violator in a place where he had told them she would not be. Clearly he was attempting to conceal her presence in San Diego. This fact, more than any other, corroborated Martinez' accusations. Even though there might be other reasonable explanations for this attempted concealment, still the inference that Rodgers and his wife, the appellant, were engaged in the crime as charged by their traveling companion was just as reasonable as any other.

We agree with the appellant that the arresting officer in the exercise of his authority should not become the tool of an informant whose possible motivations run the gamut from sheer mischief to calculated self-aggrandizement and that in avoiding this trap the officer cannot be permitted to arrest without a warrant merely on the uncorroborated tip of an informant of unknown reliability. But that is not the case here. Martinez, although unknown to the arresting officers at the time he was taken into custody and therefore unreliable, had by the time the arrest was made proved to be reasonably reliable.

▮ In determining whether reasonable grounds exist the rules cannot be hard and fast, but must, as we have said, depend upon all the circumstances. For this reason we cannot accept appellant's argument that an arresting officer must always know in advance that his informant is reliable. Whether the reliability is established before the officer is given the information or thereafter, the effect is the same so long as at the time of the arrest the officer has reasonable grounds to believe his informant. Otherwise it makes little difference when the officer became aware of such grounds.

Appellant argues that an additional factor which should have thrown doubt upon Martinez' story in the minds of the agents was that they had held Martinez in custody for over two hours when he gave them the information concerning the appellant. From this appellant contends that the rule announced in Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100, and McNabb v. United States, 1946, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, preventing the admission of a confession obtained after prolonged illegal confinement should apply equally when viewing the reliability of information obtained after confinement. True this is a factor to be considered in weighing the reliability of the information obtained, but here the informant was not in any way subjected to the same sort of treatment as existed in the Upshaw and McNabb cases. We do not feel the length of Martinez' confinement by itself was sufficient to make the information received from him during that time unreliable as a matter of law.

▮ In light of the circumstances present in the case, and despite the fact that the officers failed to take some steps which they could have taken, we cannot say that they acted without reasonable grounds in arresting the appellant.

It follows from what has been said that at the time the officers requested appellant to accompany them they had sufficient information to constitute reasonable grounds to believe that the appellant had committed a violation of the narcotics laws. We do not deem it necessary to determine the exact time of arrest or, in determining the existence of reasonable grounds, whether the information received or the observations by the officers between the time they asked appellant to accompany them and prior to their informing the appellant that she was under arrest should be considered.

▮ Appellant further argues that even if probable cause existed the agents had ample time to secure a warrant for the arrest of the appellant and that by failing to do so violated her rights under the Fourth Amendment. While it is true that the officers made no attempt whatsoever to obtain a warrant, and the arresting officer admitted that he had never in

his career obtained a warrant, still in the circumstances of this case we must conclude that the arresting officer's failure to obtain a warrant before making the arrest was justified. They did not finish questioning Martinez until after six o'clock in the afternoon. Martinez had told them that appellant and his wife were at the Greyhound bus depot in San Diego, where they expected their husbands to join them for the trip to San Francisco at approximately 5:30.

As it was, the officers did not arrive at the bus station until approximately 6:45.

Believing that the appellant possessed the narcotics, it was not unreasonable for the officers to assume that with every increasing minute of delay she and Mrs. Martinez would become suspicious of their husbands' failure to arrive as arranged and would naturally become fearful of possible detection and go on without their husbands, or in some way attempt to conceal the narcotics. Any time wasted in obtaining a warrant could well have spelled the difference between arrest and avoidance of arrest by potential narcotics carriers. Under these circumstances, even if the court was erroneous, as claimed by the appellant, in taking judicial notice that it would occasion a delay of several hours to secure a warrant of arrest for appellant, the error could not be prejudicial.

■ We are unable to find any prejudice to appellant resulting from the court's finding that Martinez had told Spohr that appellant transported heroin across the international border. Whether Martinez said in so many words that the appellant had transported the narcotics across the international line or not, the clear implication of his information to Spohr was that she had done so. The court's error, if any, in finding that Martinez had actually told Spohr that she had, therefore, is of no importance.

The appellant's final point on this appeal is that the trial court erred in refusing appellant's counsel permission to examine the report from which a government agent refreshed his memory while testifying at the hearing on the motion to suppress evidence.

■ First, we must consider the government's contention that under a stipulation, entered into between the appellant and the government, authorizing the use of the evidence introduced on the hearing of the motion to suppress to be heard and considered by the court as evidence on trial of the merits of the case, appellant waived any objections she might have to the evidence which was introduced at the hearing.[12] However, we agree with appellant that the request to allow defense inspection of a report from which a witness testified cannot be considered as an objection to the introduction of evidence, but is rather in the nature of a fatal flaw or defect in the conduct of the case by the trial court, provided his rulings relating to the request fatally affect substantial rights of the appellant. Clearly a waiver of "all objections to the introduction of * * * evidence" has nothing to do with the assertion of one's rights to inspect a document from which a witness testifies. The problem arose during the course of the cross examination of Spohr at the hearing on the motion to suppress evidence.[13] Spohr, in answer to a question by appellant's counsel, referred to his

12. The stipulation in its relevant parts is as follows:

"It is further stipulated that the defendant herein waives all objections to the introduction of said evidence except that defendant objects to the introduction of said evidence on grounds heretofore set forth by defendants in connection with their motion to suppress evidence.

"It is further stipulated that the Court may consider on trial of the merits all arguments of counsel, documents and pleadings filed in connection with said motion to suppress."

13. Page 164 of the reporter's transcript:

"Q. How much cash did he have on him? A. $2000 plus some small—oh, cash? Gee, I don't know just how much,

notes to give the exact name and address of Martinez' employer. Later when questioned regarding the amount of money in the possession of Rodgers at the time he was detained by the customs inspectors, Spohr again referred to his notes. Appellant's counsel asked to look at them. The court refused the request insofar as the amount of money was concerned on the grounds that it had nothing to do with the question of probable cause for making an arrest. The court did, however, comply with counsel's next request that he be permitted to look at the paper used by the witness to give the exact name and address of Martinez' employment. After inspecting the paper handed to him showing the place of employment, counsel made a further request to see all of the notes, but when the court

replied, "I wouldn't be surprised you would," counsel did not press the point further except to ask that the notes be marked for identification. The court not only ordered them marked but also sealed. Appellant made no further objection or request regarding the notes as a whole.

■■■ Appellant now contends under Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, that the court, in refusing counsel's request to inspect all the notes, erred in substituting its own judgment of the materiality of the notes for that of appellant. From the record, however, it is clear that appellant failed to properly raise this point at the hearing. As appears from that portion of the transcript set forth in

I have that in my notes, too. I couldn't say.

"Q. Would you like to check your notes to determine how much he had? A. I don't recall how much it was (stepping down from the witness stand).

"Mr. Steward: It must be a valuable file. Will you take your notes back to the witness stand, please, Mr. Spohr? Your Honor, I think the witness refreshed his recollection from something at the table. I would like to look at it, if I may.

"The Witness: All I do is put the amount of money at the top of the heading, Mr. Steward.

"The Court: On the amount of money, your request is denied. It has nothing to do with the question of probable cause. You may answer the question, however.

"Mr. Steward: May I look at the other paper that he used to refresh his recollection?

"The Court: On what matter?

"Mr. Steward: The earlier one on the address and occupation of the Martinez' —not the occupation, but the address.

"The Court: Do you have it there before you?

"The Witness: No, sir; that is back in the file. It is the folded up piece of paper.

"Mr. Seavey (handing document to the witness): Is this the one?

"The Witness: May I see it? (A pause)

"Mr. Steward: Is that the one you previously used?

"The Witness: Yes, it is.

"Mr. Steward: May I see it, your Honor?

"The Court: Let me look at it.

"The Witness (Handing document to the Court): The address is down at the bottom.

"The Court: Mr. Steward. (Showing document to Mr. Steward.)

"Mr. Steward: Are you just going to show me that portion of it?

"The Court: Yes, that is what you wanted to see, the notes that showed the address and Martinez' place of employment.

"Mr. Steward: I would like to see them all, your Honor.

"The Court: I wouldn't be surprised you would.

"Mr. Steward: Could it be marked, your Honor?

"The Court: For identification?

"Mr. Steward: Yes, your Honor.

"The Court: It will be marked for identification and ordered sealed by the Clerk.

"Mr. Steward: Very well, your Honor.

(The document above referred to was by the Clerk marked Defendants' Exhibit 1 for identification.)

"Mr. Steward: And also, your Honor, I would like to see the note that he looked at here to refresh his recollection as to the amount of money he had, which I think, your Honor, would be material, as one with a lot of money would probably be less likely to be involved in some illicit enterprise such as this than one without funds.

"The Court: I don't think that follows. The request is denied."

the margin, the court never actually ruled that the appellant was not entitled to see all the notes. Neither did appellant force the issue to a point where the government was compelled to decide between the possible alternatives under either the Jencks case, 353 U.S. at pages 670–672, 77 S.Ct. at pages 1014–1015; or 18 U.S.C.A. § 3500(b) (c) (d), make any motion to strike the testimony of the witness from the record of the hearing on suppression of evidence, or attempt to exclude the testimony of the witness from the evidence submitted to the court for its decision on the merits. Since appellant made no objection to the court's order sealing the notes, and failed to adequately make known to the court the action which she desired the court to take, she has failed to properly raise an objection which can be considered on appeal.[14]

■■■ Under Federal Rules of Criminal Procedure Rule 52(b), "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." We find no indication of such plain error or defects in the record before us. There were only two possible references to notes cited and both related to incidental points. Insofar as the witness made reference to his notes to determine the name and address of Martinez' employer, appellant was permitted to look at them. Appellant claims only one other instance in which the witness made reference to his notes. From the record which we have previously set forth in the margin it does not appear with certainty whether the witness actually used the notes to refresh his memory then or not. But even if he did, the court's refusal to permit an inspection of the paper which appellant claims the witness used to refresh his memory as to the amount of money in the possession of appellant's husband, though not the best practice, cannot be said to have substantially affected her rights.

Appellant has failed to include in the record on this appeal any of the notes which were ordered sealed by the court. See United States v. Palermo, 1958, 2 Cir., 258 F.2d 397, 398. There is nothing in the record as it is presented to us which would indicate that these notes contained anything affecting substantial rights of the appellant. We conclude, therefore, that the court's failure to permit an inspection of the notes by the appellant is not plain error under Rule 52 (b) permitting notice on appeal even though not brought to the attention of the court. This being so and the question not having been properly raised in the trial court, we do not now determine whether these notes are of the type described in Section 3500 or, if not, whether they could nevertheless be subject to inspection under the Jencks case.

Affirmed.

■■■■

14. Rule 51, U.S.C.A. Title 18:
 "Exceptions to rulings or orders of the court are unnecessary and for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor; but if a party has no opportunity to object to a ruling or order, the absence of an objection does not thereafter prejudice him."