**WONG SUN and James Wah Toy,
Appellants,**

v.

**UNITED STATES of America,
Appellee.**

**No. 16960.**

United States Court of Appeals
Ninth Circuit.

March 10, 1961.

Rehearing Denied April 12, 1961.

Hamley, Circuit Judge, dissented.

Sol A. Abrams, San Francisco, Cal., for appellants.

Laurence E. Dayton, U. S. Atty., John Kaplan, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before HAMLEY, HAMLIN and KOELSCH, Circuit Judges.

HAMLIN, Circuit Judge.

An indictment in two counts was filed in the United States District Court for the Northern District of California, Southern Division, charging Wong Sun and James Wah Toy, hereinafter called the appellants, in the first count with conspiracy to violate the narcotic laws, 21 U. S.C.A. § 174, and in the second count with a violation of 21 U.S.C.A. § 174 in that they "did fraudulently and knowingly conceal, transport and facilitate the transportation and concealment of a narcotic, to-wit, heroin, then and there knowing the same to have been transported and brought into the United States contrary to law." After pleading not guilty, the appellants waived a jury and were tried by the district judge. They were convicted on the charge contained in the second count of the indictment and have appealed to this court. This court has jurisdiction of the appeal under 28 U.S.C.A. § 1291.

The evidence showed that on June 4, 1959, at about 2 a. m., federal narcotic agents arrested one Hom Way for a narcotic violation. He told the agents that he had purchased an ounce of heroin the night before from a person known as Blackie Toy who operated a laundry on Leavenworth Street in San Francisco. At the time he was arrested, Hom Way possessed narcotics, but the agents had

no reason to believe that he had previously been arrested or convicted for narcotic violations. One agent testified that he had known Hom Way for about six weeks, but that Hom Way had not given him any information before as to any trafficking in narcotics by other persons. The agents then proceeded to 1733 Leavenworth Street, which premises consisted of a laundry in front and living quarters in the rear. There is some conflict in the testimony as to what occurred there, but in view of the conviction of the appellants, we shall take the version most favorable to the government. A government agent testified that he arrived at this address at approximately 6:30 a. m., rang the bell, and knocked on the door. Appellant Toy opened the door part way, and the agent told him that he wanted some laundry and dry cleaning things. Toy replied, "I don't open till eight o'clock," and told him to come back later. The agent then testified, "I pulled my badge out and told him, 'I am a federal narcotics agent.' And at that time he slammed the door and started running * * * inside his living quarters." The agent then forced the door open[1] and went in, following Toy who ran into the room where his wife was sleeping in bed with a baby. The agent ran across the room and grabbed him, saying, "Just stay where you are; you are under arrest." Toy was then handcuffed.

The premises were searched, but no narcotics were found. It is undisputed that at the time of this arrest the agents did not have an arrest warrant, nor did they have a search warrant. The record shows that while at the premises a narcotic agent said to Toy, "We understand you were furnishing narcotics to Hom Way," and Mr. Toy said, "No, I wasn't." The agent replied, "Well, we just talked to him. He is under arrest, and he says he got narcotics from you." Toy replied, "No, I haven't been selling any narcotics at all. However, I do know somebody who has." When the agent asked who, Toy replied, "Well, I only know him as Johnnie. I don't know his last name." He then told the agent where Johnnie lived, telling him the type and color of the house. According to the agent, Toy then said that he had been there the night before. The agent asked him how much "stuff" Johnnie had and Toy said that he had about a "piece."[2] He said that Johnnie had a bedroom in this house, upstairs "in his folks' house." The agents then went out to Johnnie's house, found Johnnie Yee in an upstairs bedroom and in a dresser drawer found some white paper bindles which contained heroin.

The evidence concerning the arrest of Wong Sun may be summarized as follows. On the morning of June 4 when the agents arrested Johnnie Yee, he told that one "Sea Dog," as Yee knew him, together with appellant Toy, had brought the narcotic to Yee's home around the first of June. Johnnie Yee stated that he did not know of any other name but "Sea Dog" and did not know where he lived. With this information the agents went back to appellant Toy and learned from him that "Sea Dog" was Wong Sun and that he resided on Franklin Street. The agents then took Toy and drove out to Franklin Street where Toy pointed out where Wong Sun lived. An agent rang the doorbell and, after the door had been opened by a woman, he asked for Mr. Wong. This woman was on the landing of the stairs, but before she answered another lady, Betty Wong, appeared at the top of the stairs. The agent who rang the bell said that he was from the Federal Bureau of Narcotics. Another agent said, "Hello, Betty," and they then went up the stairs and into a back room where they were told that Wong Sun was sleeping. Wong Sun was arrested and handcuffed, and the premises were searched.

The testimony shows that subsequent to the arrests each appellant separately was interviewed by a federal narcotic

---

1. It was stipulated that the door was broken and splintered around the lock.

2. About one ounce.

agent. The agent testified that before talking to the appellants he told each of them that he was entitled to the advice of an attorney; that he didn't have to answer the questions unless he voluntarily did so; and that the statements that he made could be used against him. Each was also told that the agent was making no promises of "any bargains or deals or anything with him." A discussion was then had with each appellant as to the circumstances of the narcotic transactions. There were questions and answers and the appellant being questioned was then asked to repeat the whole thing to the agent who at that time took it down in rough note form. Subsequently these notes were transcribed and a typewritten statement was prepared. Each appellant was shown his own statement, and it was read to him in English and also interpreted to him in Chinese. Toy "read it out loud to me, and there was only one word he couldn't pronounce, but he knew the meaning of it." He was then asked if he wished to sign his statement.

"He said he had no objection to doing so, but first he wanted to know if the others involved in this investigation or case had signed theirs. I said I couldn't give him that information in all fairness to other persons; and he said, 'Well, unless you can prove to me that they have signed theirs, I don't want to sign it.'

"I asked him if all the information contained in this statement which he had read and I had read to him were true and correct, and he stated, 'Yes, they were' * * *."

A similar conversation was had with appellant Wong Sun in which he also said that all of the facts stated in the statement prepared by the agent were true, but he likewise refused to sign the statement. During the trial these statements were offered in evidence and were admitted over the objection of appellants.

The statement made by each appellant to the agent was sufficient to amount to a confession that such appellant, together with the other appellant, transported heroin to Yee's house and left it there.

Upon this appeal appellants rely mainly upon the following points: (1) That the arrest of each appellant was an illegal arrest, having been made without a warrant of arrest and without probable cause therefor; (2) That since the arrests were illegal, the confessions of appellants were improperly received in evidence, being the results of illegal arrests; (3) That the information received by the agents prior to the confession of Toy and Wong Sun could not be used because it was "the fruit of the poisonous tree"; (4) That the confession of each appellant was improperly admitted into evidence, because there was no proof of a *corpus delicti*; (5) That the admission in evidence of each of the written statements prepared by the agent after his conversation with each appellant was improper.

We shall consider these points in the above order.

■■■ An arrest without a warrant may not be made unless the officer making the arrest has "probable cause" within the meaning of the Fourth Amendment and "reasonable grounds" within the meaning of the Narcotic Control Act of 1956 [3] to believe that the person arrested had committed or was committing a violation of the narcotic laws. If the officer making the arrest has such a belief, the arrest, though without a warrant, is lawful. Rodgers v. United States, 9 Cir., 1959, 267 F.2d 79; Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; Carroll v. United States, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; Draper v. United States, 1958, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed. 2d 327. In this case, the officers went to Toy's laundry and home solely by reason of the statement of a Chinese, arrested a few hours before, that he had purchased narcotics from Toy. While

3. The appropriate provisions of the Narcotic Control Act of 1956 are set forth in 26 U. S.C.A. § 7607.

the record does show that the agent said that he had known Hom Way for six weeks, it does not show in what way he had known him; there is no evidence that Hom Way had ever given any reliable information to the officers upon any previous occasion. In fact, there was evidence to the contrary; to-wit, that they had not received any information from him on prior occasions. As this court said in Rodgers v. United States, supra [267 F.2d 85], " * * * where the officer makes an arrest without any knowledge of the commission of a crime except from an informer whom he does not know to be reliable, the courts have consistently held there is no reasonable grounds for the arrest." There is no showing in this case that the agent knew Hom Way to be reliable.

■ The government urges, however, that the events which transpired at Toy's house at 6:30 in the morning were sufficient to provide reasonable cause for the arrest. These events have been set out earlier in this opinion. They are that after the agent had got the door of the laundry opened by stating that he wanted some laundry and after being told by Toy to come back at eight o'clock, he then pulled out his badge and said, "I am a narcotics officer." With that Toy closed the door and ran back into his bedroom. Admittedly, the agent then forced the door and ran after Toy into the bedroom where he arrested him. We see nothing in the circumstances occurring at Toy's premises that would provide sufficient justification for his arrest without a warrant. We therefore hold that his arrest was illegal.

Concerning the arrest of Wong Sun, the facts show that the agent went to the door of the premises where he lived on an upper story. After ringing the bell, the door was opened by a buzzer, and after the question was asked, "Is Mr. Wong in?" the agents went up the stairs, into the bedroom where Wong Sun was sleeping with his wife and child, placed him under arrest, and handcuffed him. The basis for going to Wong Sun's residence to arrest him was the statement of

Johnnie Yee that he had obtained the narcotic found in his residence from Wong Sun and Toy. As was the case with Hom Way, there is no showing that Johnnie Yee was a reliable informer; in fact, the evidence is entirely negative as to whether the agents had ever heard of him before that day. We hold, likewise, that the arrest of Wong Sun was not made with probable cause or with reasonable grounds to believe that he had committed or was committing a crime. Therefore his arrest was illegal.

This brings us to the appellants' second contention.

■ There has been no contention made in this case that the confession of either appellant was involuntary or was obtained by means of force, threats, or other forms of duress. Neither has there been any contention that the confession of either appellant was the result of long detention or psychological pressure or was accompanied by failure to promptly bring him before a United States Commissioner for arraignment. These practices have been denounced in McNabb v. United States, 1943, 318 U. S. 332, 63 S.Ct. 608, 87 L.Ed. 819; Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100; Mallory v. United States, 1957, 354 U.S. 449, 77 S. Ct. 1356, 1 L.Ed.2d 1479; and many other cases. No evidence that would bring this case within the prohibitions of these last mentioned cases has been introduced.

In United States v. Walker, 2 Cir., 1952, 197 F.2d 287, 289, the appellant contended that he was illegally arrested and that he confessed while he was being held by virtue of an illegal arrest. The court admitted the confession into evidence, saying "This was a voluntary confession. The fact that it was made while he was under illegal arrest does not make it incompetent." In Smith v. United States, 1958, 103 U.S.App.D.C. 48, 254 F.2d 751, 758, the appellant moved that his confession be excluded since it was made in the course of an illegal arrest. The court held that the arrest was legal, but stated, "We believe the rule to be

that confessions made while a defendant is under arrest are admissible in evidence if voluntarily made and if Rule 5, Federal Rules of Criminal Procedure, 18 U.S.C.A., is not violated, whether the arrest was legal or illegal." In Dailey v. United States, 5 Cir., 1959, 261 F.2d 870, 872, the appellant contended that his arrest was illegal. The court held that the arrest was legal, but stated "Even if the arrest and detention were illegal, we take the position that the confession was admissible, since there is no evidence that the confession was induced by the detention."

We hold that the fact that these confessions were obtained while the appellants were held under illegal arrest does not render them inadmissible.

 We likewise find that appellants' reliance upon the so-called "fruit of the poisonous tree" doctrine is misplaced.[4]

When that doctrine has been invoked the evidence seized or the information obtained by illegal wire-tapping has been seized or obtained without the consent or against the will of the person involved. In this case any statements made by Toy prior to his confession were voluntary. There is no contention made nor is there any evidence tending to establish that these statements were in any way the result of pressure or coercion or made during unreasonable detention.

We hold that the illegal arrest did not so contaminate the voluntary pre-confession statements as to prevent the use by the officers of the information given therein.

 The next contention of appellants is that there was not sufficient evidence corroborating appellants' confessions. The question of the quantum of corroboration necessary to substantiate a confession was discussed in Smith v. United States, 1954, 348 U.S. 147, 75 S.Ct. 194, 199, 99 L.Ed. 192. The Supreme Court there said:

"There has been considerable debate concerning the quantum of corroboration necessary to substantiate the existence of the crime charged. It is agreed that the corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that defendant is guilty. Gregg v. United States, [8 Cir.] 113 F.2d 687; Jordan v. United States, [4 Cir.] 60 F.2d 4; Forte v. United States [68 App.D.C. 111, 94 F.2d 236, 127 A.L.R. 1120], supra; Daeche v. United States [2 Cir., 250 F. 566], supra. But cf. United States v. Fenwick [7 Cir.], 177 F.2d 488. In addition to differing views on the substantiality of specific independent evidence, the debate has centered largely about two questions: (1) whether corroboration is necessary for all elements of the offense established by admissions alone, compare Ercoli v. United States [76 U.S.App.D.C. 360, 131 F.2d 354], supra, and Pines v. United States [8 Cir., 123 F.2d 825], supra, with Wynkoop v. United States [9 Cir., 22 F.2d 799], supra, and Pearlman v. United States [9 Cir.], 10 F.2d 460, and (2) whether it is sufficient if the corroboration merely fortifies the truth of the confession, without independently establishing the crime charged, compare Pearlman v. United States, supra, and Daeche v. United States, supra, with Pines v. United States, supra, and Forte v. United States, supra. We answer both in the affirmative. All elements of. the offense must be established by independent evidence or corroborated admissions, but one available mode

---

4. This so-called doctrine is discussed in Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 268, 84 L.Ed. 307; Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, and United States v. Coplon, 2 Cir., 185 F.2d 629, 28 A.L.R.2d 1041.

of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused. Cf. Parker v. State, 228 Ind. 1, 88 N.E.2d 556 [89 N.E. 2d 442]."

In this case the narcotic was found in the residence of Yee. This in itself establishes that someone was guilty of concealment and transportation of narcotics in violation of 21 U.S.C.A. § 174. This narcotic was introduced into evidence. The advance statement of Toy that narcotics could be expected to be found in Yee's house, and that he was familiar with that house and the place where the narcotic was stored, together with the subsequent admissions of Toy and Wong Sun that they had brought the narcotic to Yee's house, amount to sufficient evidence to support the conviction. We believe that there was sufficient evidence to fortify the truth of the confessions and to justify the belief that the post-arrest statements of the appellants as to the concealment and transportation of the narcotic were reliable. Leonard v. United States, 9 Cir., 1960, 278 F.2d 418; Lohmann v. United States, 9 Cir., 1960, 285 F.2d 50.

■ The fourth contention is that the written statements prepared by the agent after his conversation with each appellant were not admissible because such written statements were not signed by the appellants.

The agent testified that after he had written out the statements, each appellant read his own statement; each was then asked whether the statement was true; and each answered that it was. The statements were then offered in evidence and were admitted by the court. While this does not appear to be the usual method of introducing statements of defendants, we cannot say that the defendants were prejudiced thereby. If the agent had been asked to give the conversation that he had had with each appellant and then had read the statement that he had prepared, stating that it contained the substance of the conversation, there could have been no objection. Counsel, with the statement in evidence and having it before him, could have cross-examined the agent as to any particular admission made therein and could have obtained in detail from the agent on cross-examination the same information as if the agent had read the statement in evidence. The record shows that after the statements were admitted into evidence experienced counsel representing appellants made no attempt whatever to cross-examine the agent as to any of the statements made by either appellant. Taking into account all of the circumstances, we see no error in the admission of the statements.

The judgment is affirmed.

HAMLEY, Circuit Judge (dissenting).

In my view the convictions should be set aside because as to both appellants the government developed its case on the basis of information obtained from Toy at his home immediately after enforcement officers made an illegal entry into that home. The fact that the information was derived from voluntary statements made by Toy at that time and place, rather than as a result of the seizure of physical objects (Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319) or observations made by law enforcement officers while illegally on the premises (McGinnis v. United States, 1 Cir., 227 F.2d 598), seems to me immaterial.

As I understand it, the test of the "fruit of the poisonous tree" doctrine (Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 268, 84 L.Ed. 307) is whether the government seeks to avail itself of knowledge which it would not have had but for the lawless conduct of enforcement officers. For all that is shown in this record, the government would not have known of Johnnie Yee and so built its case had not an illegal entry of Toy's home been effected.

The guarantees of the Fourth Amendment are too fundamental to warrant hair-splitting distinctions between information based on physical evidence ob-

tained or observations made at the scene of an illegal entry and information based on voluntary statements by the defendant at the scene of the illegal entry. The chances are always pretty good that law enforcement officers can obtain valuable leads during the course of adroit questioning. If such leads are not to be regarded as contaminated harvest, the "fruit of the poisonous tree" doctrine will no longer serve its designed purpose of discouraging Fourth Amendment violations.

I realize that a contrary view was expressed in Smith v. United States, 103 U.S.App.D.C. 48, 254 F.2d 751, one judge dissenting. But the force of that pronouncement is undermined by the fact that it was given only as an alternative ground for affirmance, the court having already determined that the arrest and search were legal. I find much more convincing the contrary view expressed by the same court speaking through Circuit Judge (later Chief Justice) Vinson in Nueslein v. District of Columbia, 73 App.D.C. 85, 115 F.2d 690.