LEONARD FIELDS V. STATE OF NEBRASKA.

FILED SEPTEMBER 22, 1933. No. 28787.

*Stevens & Stevens,* for plaintiff in error.

*Paul F. Good, Attorney General,* and *George W. Ayres, contra.*

Heard before GOSS, C. J., GOOD, DAY and PAINE, JJ., and CHASE, LOVEL S. HASTINGS and TEWELL, District Judges.

CHASE, District Judge.

Plaintiff in error, Leonard Fields, was, with one Walter Brown, jointly charged with the crime of murder for the slaying of one Wayne Rank. Both defendants demanded separate trials which were allowed by the trial court, and both were convicted of murder in the second degree. The plaintiff in error presents the record of his conviction to this court for review.

The evidence, which, in the main, is without serious dispute, shows that the plaintiff in error (who will be hereinafter termed the accused), together with a man by the name of Walter Brown, whose wife is a cousin of the accused, in the beginning hours of the morning of September 15, 1932, left Brown's home in the town of Arapahoe in an automobile truck owned by Brown on what may be termed a "stealing expedition." According to the statement of the accused, which was admitted in evidence, they went out to steal gasoline. The evidence shows that they prowled about the countryside in the vicinity of the town of Arapahoe for some time, and after having stolen some chickens at one place they finally arrived at the farm home of one Lester Smith about 1:30 or 2 o'clock in the morning. The Smith residence is located on a byroad from the main highway and which road led up to the buildings on the farm. The accused with his confederate drove into the Smith premises past the house and up to a shed which was employed at that time by Smith as a garage, and which was located some distance past the house, then

turned the truck around and drove out of the yard some distance down the roadway where the truck was stopped. Later Smith and his son-in-law, Wayne Rank, the deceased, who had been aroused from their slumbers by the noise of the truck, became suspicious. Smith armed himself with a shotgun and the deceased took a .22 rifle and both went out of the house to the vicinity of the garage where their automobiles were housed. As they approached the garage they saw two men hurrying across the garden patch which was located immediately southeast of the shed. They called to the fleeing parties to halt or they would shoot. This command being disobeyed, both Smith and Rank proceeded to discharge their weapons. The accused testified on the witness-stand, and in a statement received in evidence, that he received several pellets of shot, presumably from the shotgun held by Smith. The fleeing parties disappeared temporarily from sight, whereupon Smith and Rank proceeded to run down the roadway, as they termed it "to head them off." When they arrived approximately 300 feet from where they originally stood when the shots were fired they could observe two men over in a depression or draw near by. The testimony shows the moon was shining very brightly and one could observe the outline of a person for some distance, but it was not light enough to determine the identity of the party. At this point Smith testifies that another shot was fired by a .22 rifle, the bullet therefrom taking effect in the body of Wayne Rank from which he died some days later.

The accused made several statements concerning his whereabouts on the night in question. Two statements were made before a stenographer who took the same in shorthand. He therein admitted that he had gone out on that occasion with Brown on a stealing expedition to steal gas; that they stole some chickens first and then went to the Smith premises for the purpose of stealing gasoline; that they drove into the Smith premises up to a point about where the garage was located, turned the truck around in the dooryard and proceeded down the highway

some 300 feet, where it was stopped. Brown at this point got out of the truck taking with him a pail, a short hose and a .22 rifle. He started toward Smith's garage to get the gasoline. He got the gasoline, which was before the shooting, and poured it into the truck tank. The accused got out and followed him and on the way back to the truck things happened just about as detailed by the witness Smith; that they were using Brown's truck on this occasion.

Other witnesses testified to inspecting the dust in the highway at that point and observing tracks of an automobile truck with dual rear wheels, or double wheels, the outside wheel making a distinct diamond-shaped mark such as is made by a Goodyear tire, while the tires on the inside wheels having been worn smooth, the identifying marks made thereby were very indistinct. When the accused was arrested at Brown's premises in Arapahoe, they found at Brown's home an automobile truck having dual wheels on the rear, the outside tires being little worn and having a distinct diamond tread while the inside ones were worn so smooth as to make little if any marks in the dust. The truck there found was the color and design testified to by Smith of the one he had seen in his farm-yard on the morning in question. The accused also admitted that he received several pellets from the discharge of a shotgun on the Smith premises on that morning, and the testimony shows that the undergarments he was wearing at the time of his arrest had distinct stains thereon. The testimony further shows that Walter Brown, after his arrest, took the sheriff to a wooded ravine near the town of Arapahoe in which under some silt and drift he uncovered a .22 rifle which was alleged to have been used on the occasion of the shooting.

The doctor testified that he removed from the body of the deceased, after his death, a small leaden bullet which was testified to by another witness as being the bullet from a .22 cartridge. The doctor testified further that the wound upon the body of the deceased produced his death.

Smith testifies that he heard a shot come from the vicinity of where the two men were in the ravine and that this shot took effect in the body of Wayne Rank and which produced his death. The accused testified that he did not have a weapon or fire a shot, nor did he see or hear Walter Brown fire a shot or hear one fired. As to that important fact the evidence is largely circumstantial.

Several assignments of error have been made, but only four are stressed as being sufficient to justify a reversal. The action of the trial court is assailed for permitting, over the objection of the accused, two witnesses, who are stenographers, to read from their shorthand notes the alleged confessions to officers while he was in their custody, under arrest, claiming they were made while he was under arrest and in the custody of officers without conveying the information to the accused that they might subsequently be used against him.

This court has held on numerous occasions that, after the *corpus delicti* has been sufficiently established, voluntary confessions or statements made by the accused may be admitted in evidence for the purpose of connecting the accused with the commission of the offense. *Ashford v. State,* 36 Neb. 38; *Bode v. State,* 80 Neb. 74; *Fouse v. State,* 83 Neb. 258; *Johnson v. State,* 88 Neb. 565; *Hardin v. State,* 92 Neb. 298; *Witty v. State,* 105 Neb. 411.

In order for confessions or admissions to be admissible, it must be shown that they were voluntary, and unless they are voluntarily made they are inadmissible. This record discloses that each time before any evidence of the confessions was received the state inquired of the witness whether or not such statements were obtained under threats, promises, inducements or intimidating gestures, and each witness, to each question, answered in the negative; and the accused, in his own testimony, did not deny the voluntary character of his statements. Therefore, we must conclude that such statements were voluntarily made by the accused, and, as such, properly admitted.

The accused further contends that to permit the two

young women stenographers who had not extended their shorthand notes to testify upon the witness-stand by reading from their shorthand notes is error. The rules of criminal evidence permit one who overhears a person charged with a criminal offense make a statement or admission against his interest, to testify from memory as to what the witness said. To read a confession or admission, otherwise admissible, from shorthand notes of a stenographer taken down at the time would be infinitely more accurate than for a witness to testify from memory as to statements. The conduct of the witnesses in this record was not a refreshment of their memory as to what was done, but they read from the shorthand record the exact language used by the accused in making such statement. The claim that reversible error was committed in admitting such statements in evidence is wholly untenable.

The accused also claims that the trial court committed error by withdrawing the question of manslaughter from the consideration of the jury. It will be borne in mind that the defendant was convicted of murder in the second degree. On this branch of the case it becomes necessary to analyze the statutes defining murder in the second degree and manslaughter.

Section 28-402, Comp. St. 1929, defines murder in the second degree as follows: "Whoever shall purposely and maliciously, but without deliberation and premeditation, kill another, every such person shall be deemed guilty of murder in the second degree."

Section 28-403 of the same volume defines manslaughter as follows: "Whoever shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, shall be deemed guilty of manslaughter."

It will be noted that the chief distinction between the crime of murder in the second degree and manslaughter is that in the former the killing must be purposely done, while in the latter if it is unlawfully done it will be sufficient. This record discloses, as has been herein stated,

that this accused with his associate left the automobile truck for the purpose of going to the Smith place to steal gasoline, knowing also that Brown carried in his hand a deadly weapon which could be carried for no other purpose than to be used, if it became necessary, in furtherance of the criminal design; that the shooting occurred on a bright moonlight night and the moonlight was so bright that the outline of a human being could be observed for some distance; that both he and Brown observed two men who later were proved to be Smith and Rank, and Smith and Rank observed two men who later it was developed were Brown and the accused. There is no evidence that any quarrel or altercation arose between the parties and, as light as it was, to take the view that the shot that killed the deceased was fired at random or unintentionally while the slayer was in the commission of some unlawful act would neither be a reasonable nor logical deduction to be drawn from the evidence. If either Brown or the accused pointed the gun at the deceased, or some other person, and purposely fired the gun, then the intent to kill became specific and the elements of the crime of manslaughter would be wholly lacking. This we must conclude from the record to be the mental attitude of the person who fired the fatal shot. Under the statute, one who purposely kills another is guilty of murder. A deadly weapon, intentionally pointed at a human being, which is discharged, and from a wound inflicted thereby death ensues, the only reasonable inference to be drawn is that such killing was purposely and maliciously done, and if deliberation and premeditation are absent, the crime of murder in the second degree is complete.

Manslaughter occurs when death follows without the slayer forming the specific intent or purpose to kill. If the intent or purpose to kill is present, the crime is murder and not manslaughter.

From the state of the whole record as to this contention, it is apparent that reasonable minds could not differ

on the proposition that whoever fired the fatal shot that caused the death of Wayne Rank fired the same purposely and maliciously. Therefore no element of the crime of manslaughter is involved under the practically undisputed evidence of this phase of the case. It might be argued in this connection that positive evidence is wholly lacking that this accused actually participated in firing the shot that resulted in the death of Wayne Rank and therefore he could not be guilty of murder. However, the courts have expressed themselves with almost unanimity as to such contention.

"It is a familiar general rule that when several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance or in prosecution of the common design for which they combine. Applying the principle to the subject under consideration, the courts hold that if several persons combine or conspire to do an unlawful act, and in the prosecution of the common object a culpable homicide results, all are alike criminally responsible. The immediate injury, from which death ensues, is considered as proceeding from all who are present and abetting the injury done, and the actual perpetrator is considered as the agent of his associates. His act is their act, as well as his own; and all are equally criminal." 13 R. C. L. 729, sec. 29.

"Prearrangement is not essential, however, for it suffices that the combination was entered into in an emergency. Nor is it necessary, in order to make a party liable, that he should be actually and immediately present at the commission of the offense. If he cooperates in the execution of the common purpose by watching at a proper distance to prevent surprise, or the like, or if, with the intention of giving assistance, he remains near enough to afford it if the occasion for it should arise, he is constructively present, and is equally guilty with those who are actually present and do the act." 13 R. C. L. 729, sec. 30.

"If the unlawful act agreed to be done is dangerous * * * or if its accomplishment will necessarily or probably require the use of force and violence, which may result in the taking of life unlawfully, every party to such agreement will be held criminally liable for whatever any of his coconspirators may do in furtherance of the common design. Accordingly, one person may be held liable for the homicidal act of another, where such act results from their combined efforts to commit robbery, burglary, breaking in and stealing, or assault merely." 13 R. C. L. 730, sec. 31.

The record discloses that the accused accompanied Walter Brown on the night in question to assist him in the stealing of gasoline; that they drove to the Smith premises in furtherance of that design; that Brown got out of the truck and went to the garage and the accused followed along close behind to render any assistance that might become necessary in the carrying out of their criminal enterprise; that after the shots were fired the accused ran to the truck, started it up and drove up the road to pick up Brown for the purpose of adding haste to their escape. Such circumstances would make the accused guilty of the crime whether he actually fired the fatal shot or not and under which the court properly withheld from the consideration of the jury the crime of manslaughter.

The accused again complains that the trial court in its instructions committed error in the definition of "malice," wherein the jury were told that malice means a "wilful or corrupt intention of the mind." In the recent case of *Pembrook v. State,* 117 Neb. 759, Judge Thompson in the body of the opinion states that " 'malice,' in its legal sense, denotes that condition of mind which is manifested by the intentional doing of a wrongful act without just cause or excuse. It means any wilful or corrupt intention of the mind." It will be observed that this court has held that the very language herein assailed is proper language to be used in the definition of the term "malice."

Therefore, it goes without saying that the complaint of this instruction by the accused is without force.

We have carefully examined the whole record and find the evidence amply sufficient to sustain the conviction, and the same is, therefore,

AFFIRMED.