UNITED STATES of America,
Appellee,

v.

Ruth SMITH, Appellant.

No. 368, Docket 27476.

United States Court of Appeals
Second Circuit.

Argued June 7, 1962.

Decided Sept. 18, 1962.

658

Julius Itzkowitz, New York City (Myron G. Lasser, New York City, on the brief), for appellant.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York (Robert M. Cipes, Arnold N. Enker, Asst. U. S. Attys., of counsel), for appellee.

Before CLARK, WATERMAN and MOORE, Circuit Judges.

WATERMAN, Circuit Judge.

After a trial before a judge sitting without a jury in the United States District Court for the Southern District of New York, appellant was convicted on March 15, 1962, on two counts of a five count indictment. The two counts under which she was convicted, counts three and four, charged her with receiv-

ing, concealing, and facilitating the transportation and concealment of narcotics in violation of 21 U.S.C.A. §§ 173, 174 (1958). The district court sentenced appellant to five years imprisonment upon count three, and seven years imprisonment upon count four, the two sentences to run concurrently. Appellant now appeals from her conviction.

Appellant made a motion, subsequently denied, for an order suppressing certain evidence, some taken from her person and some obtained by the officers from an apartment. The testimony and exhibits presented by the Government at the hearing on this motion and at appellant's subsequent trial developed the following facts relating to appellant's arrest and the events that followed. Appellant presented no evidence at either the hearing or the trial.

On October 11, 1961, shortly after 1:30 P.M. at an apartment in Hamilton Terrace in Manhattan, narcotics agents Robinson and Scott, acting in undercover capacities, were negotiating with one George A. Thompson for the purchase of one-quarter kilogram of heroin. Thompson told the agents that one-quarter kilogram would cost them about $3,200, but that he would have to go out and check on the price.

At approximately 2:05 P.M. Thompson left the apartment in order to check the price he had quoted to the agents. After leaving the apartment, Thompson was followed by two other narcotics agents, Wilcocki and Garofalo. Thompson entered a taxi and rode to the Manufacturers Trust branch bank at 125th Street and Eighth Avenue. He remained in the bank for about five minutes, then entered another taxi and went to a building at 169 East 115th Street, which he entered.

He emerged from the building five minutes later with appellant Ruth Smith. Then he caught a taxi back to Hamilton Terrace, arriving there at approximately 3:00 P.M.

Upon his return to the apartment at Hamilton Terrace where agents Robin-

son and Scott were waiting, Thompson informed them that one-quarter kilogram of heroin would cost $3,600. He showed the agents two one-ounce glassine bags containing a white powder that he claimed he had obtained from his source of supply. Agent Robinson asked Thompson who this source of supply was and was told that it was a woman who worked at a store. Thompson and agent Robinson then arranged to meet again at 2:00 P.M. the next day at 145th Street and St. Nicholas Avenue so that Robinson could purchase a quarter kilogram of heroin.

After their conversation in the apartment Thompson invited the two agents to lunch at a restaurant on 42nd Street. While at the restaurant the three men entered the men's restroom, where Thompson pulled out of his pocket two glassine bags of white powder and gave one of the bags to agent Scott. This bag contained heroin.

The next day, October 12, agent Robinson met Thompson at 2:30 P.M. at the corner of 145th Street and St. Nicholas Avenue. Thompson asked for the purchase price of $3,600, but agent Robinson refused to hand over the money. Instead, the officer opened the trunk of his car and showed Thompson what was supposed to be the $3,600. Thompson then told Robinson that he would go to his source of supply and find out if she would deliver the heroin, cash on delivery.

Thompson then caught a taxi and, under the surveillance of narcotics agents Wilcocki and Garofalo, drove to 169 East 115th Street. After ten minutes Thompson emerged from the building and returned to 145th Street and St. Nicholas Avenue, where he rejoined Robinson and informed the agent that the source of supply would deliver the heroin, cash on delivery. Since the federal officer was to meet the source and receive the heroin from her, he asked Thompson who she was. Thompson told him that she was a girl named Ruth who had "blue hair" and worked at Goody's drug store.

Next, Thompson and Robinson walked over to a telephone booth and Thompson placed a call. He said, "May I speak to Ruth?" (pause) "Okay, I will call back in 15 minutes."

Then, on the pretext of calling his girl friend, Robinson telephoned his office and told the agents there that Thompson's source of supply was a girl by the name of Ruth who worked at Goody's drug store and had blue hair.

At 4:00 P.M. Thompson again telephoned the number he had called earlier and was heard by Robinson to say, "Okay, in 30 minutes at 131st and Seventh Avenue."

At this point Robinson gave a prearranged signal; then the covering agents Wilcocki and Garofalo placed Thompson under arrest, searched him, and found in his pocket a glassine envelope containing heroin. Upon subsequent interrogation of Thompson these two agents learned that a girl named Ruth Smith was to deliver a quarter of a kilogram of heroin at 4:30 P.M. at the corner of 131st Street and Seventh Avenue. Agents Wilcocki and Garofalo also "arrested" agent Robinson and placed him in a separate car from the one in which they put Thompson.

The three agents, with Thompson, then drove to 131st Street and Seventh Avenue. By this time several other narcotics agents had converged on this location. They observed appellant, who had come from Goody's drug store, enter a building at 108 West 131st Street, emerge after ten or fifteen minutes, and start to walk across Seventh Avenue on 131st Street. At she crossed Seventh Avenue, two additional narcotics agents, Krueger and Cantu, arrested her, searched her purse, and found a small package containing 131 grams of heroin. Krueger and Cantu did not possess a warrant of arrest.

The facts recited above relate to appellant's first contention upon this appeal: namely, that appellant was illegally arrested and searched. The following factual account relates to her second

contention, that after her arrest officers committed an illegal search of premises at 108 West 131st Street.

Having arrested appellant, Krueger and Cantu seated her in the back seat of Garofalo's car. At this point there is a divergence in the testimony of agent Cantu and that of another participating agent, Manley. Cantu testified that appellant was driven up Seventh Avenue about to 142nd Street in agent Garofalo's car; and that en route, a trip of five to ten minutes, agents Garofalo and Tripodi asked her where she got the package, and who was in the apartment house they had been watching (presumably at 108 West 131st Street), to which she replied that she did not know. He also testified that they parked at 142nd Street, that appellant remained in the car, and that there agent Manley assumed the bulk of the interrogation, questioning appellant for more than half an hour.

Agent Manley testified, however, that at 131st Street, immediately after the arrest, he put appellant in his own car, that with agent Rahas he drove her to 142nd Street and Seventh Avenue, that en route there was no conversation with appellant, and that once the car was parked he began to interrogate her. From either account we conclude that appellant was driven ten blocks up Seventh Avenue and that agent Manley commenced his interrogation as soon as the trip was ended.

During his questioning Manley asked appellant where the rest of the narcotics were. She said she did not have any more. Agent Manley said, "Come on, Ruth, you know better than that."

Mrs. Smith then began to cry and said, "Yes, I have some more but I don't want to get anyone else in trouble." She informed the narcotics agent that she had thrown out her husband because he had been dealing in narcotics and now she herself felt ashamed to be in the position she was in.

The agent replied, "Ruth, if that is your own, you won't be getting anybody else in trouble."

Appellant answered, "All right. I will take you to it but I will only take two of you. I don't want anyone else to go with me because I don't want to cause any trouble."

Appellant led the narcotics agents back to 108 West 131st Street, the building she had been observed to enter just prior to her arrest. Mrs. Smith took agents Manley and Rahas to a top floor apartment. There she knocked. An old man answered the door. Mrs. Smith said to him, "Danny, there is no trouble. I just want my suitcase." The old man stepped aside, and, followed by the two federal officers, appellant entered the apartment. She walked over to a bed, reached behind it, pulled out a suitcase, and placed it on the bed.

To Manley she said, "The stuff is in the suitcase."

He replied, "Okay, Ruth, I will get it out." Then appellant handed him a key, with which he opened the suitcase. In the suitcase Manley found a brown paper bag which contained eleven packages of heroin, weighing over two and a third kilograms.

After Manley had shown the contents of the bag to Rahas, the agents, with appellant in custody, left the apartment, taking with them the heroin which they had discovered there. The agents made no further search of the premises.

From 131st Street the narcotics agents drove to appellant's residence on 115th Street near Second Avenue. Agents Rahas and Garofalo went with appellant to her apartment and there recovered $500.00 which the Government had used to purchase narcotics on previous occasions, appellant taking the money out of a suitcase and handing it to the federal officers. They were in this apartment for no more than five minutes. While the others were in the apartment on 115th Street, agent Manley remained downstairs in the car with the narcotics taken from the 131st Street apartment. Then the officers drove appellant to the offices of the Bureau of Narcotics at 90 Church

Street in Manhattan, arriving there sometime between 5:30 and 6:30.[1]

■ As we stated earlier, the first question upon this appeal is whether appellant's arrest on the corner of 131st Street and Seventh Avenue was a legal arrest. If illegal, the search of her purse incident to that arrest was an illegal search, and the narcotics so discovered would be inadmissible as evidence of appellant's guilt. See Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L. Ed. 145 (1925); United States v. Walker, 246 F.2d 519 (7 Cir.1957); Wrightson v. United States, 95 U.S.App.D.C. 390, 222 F.2d 556, 559 (1955).

The relevant statute is Narcotics Control Act § 104(a) (2), 70 Stat. 570 (1956), 26 U.S.C. § 7607(2) (1958). It states in pertinent part:

"§ 7607. *Additional authority for bureau of narcotics and bureau of customs*

" * * * [A]gents, of the Bureau of Narcotics of the Department of the Treasury * * * may— * * *

"(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs (as defined in section 4731) or marihuana (as defined in section 4761) where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

■ Therefore, the question becomes one of whether the agents had "reasonable grounds," or, as it is more often labeled, "probable cause," for believing that appellant had committed or was committing a violation of the narcotics laws. The scope of section 104(a) (2) of the Narcotics Control Act is substantially equivalent to the extent of the permission granted to law enforcement officers by the Fourth Amendment. See Draper v. United States, 358 U.S. 307, 310, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Rodgers v. United States, 267 F.2d 79, 84 (9 Cir.1959).

The principles involved in the concept of probable cause, which justifies an arrest without a warrant, are set forth in the oft-quoted opinion of the Supreme Court in Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949):

"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

" 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' McCarthy v. De Armit, 99 Pa.St. 63, 69, quoted with approval in the Carroll opinion. 267 U.S. at 161 [45 S.Ct. at 288, 69 L.Ed. 543, 39 A.L.R. 790]. And this 'means less than evidence which would justify condemnation' or conviction, as Marshall, C. J., said for the Court more than a century ago in Locke v. United States, 7 Cranch 339, 348 [3 L.Ed. 364]. Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of

---

1. At the hearing on the motion to suppress, agent Manley testified that after leaving the first apartment, 108 West 131st Street, the officers took Mrs. Smith directly to their office at 90 Church Street. At the subsequent trial, however, he testified that at the time of the earlier hearing he had forgotten about the visit to the 115th Street apartment.

reasonable caution in the belief that an offense has been or is being committed." Carroll v. United States, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543, 39 A.L.R. 790].

"These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." (Footnotes omitted.)

See Draper v. United States, supra, 358 U.S. at 311-312, 79 S.Ct. 329; United States v. Heitner, 149 F.2d 105, 106 (2 Cir.), cert. denied sub nom. Cryne v. United States, 326 U.S. 727, 66 S.Ct. 33, 90 L.Ed. 432 (1945); Cervantes v. United States, 263 F.2d 800, 803 (9 Cir. 1959).

In the light of these principles there was abundant evidence to support a finding that the officers had probable cause to justify their arrest of the appellant.

Thompson told two narcotics agents operating in undercover capacities that his source of supply was a girl whose description fitted that of the appellant. This information standing alone was perhaps not enough to give the Government reasonable grounds for arresting Mrs. Smith, for when the agents' only knowledge of the defendant's crime is the statement of an informer who the agents do not know to be reliable, it has generally been held that the agents do not have probable cause for an arrest. See Rodgers v. United States, supra, 267 F.2d at 85; Contee v. United States, 94 U.S.App.D.C. 297, 215 F.2d 324, 326-327 (1954), and cases cited therein at 327 n. 1; Wrightson v. United States, supra, 222 F.2d at 558 n. 3; Cervantes v. United States, supra, 263 F.2d at 804 (dictum). The Government asserts that a statement by a narcotics peddler to a federal agent while in disguise is more trustworthy than the word of a knowing informer. Appellant naturally takes the contrary position. In passing, we only observe that there was a valid reason for honesty on Thompson's part: the arrangement under which the heroin was to be sold to the agent required that the agent meet appellant and, therefore, required that the agent be able to identify her.

Moreover, there is extensive reliable evidence, additional to the word of a narcotics peddler, sufficient to establish the requisite probable cause to justify the arrest in this case. On October 11, in order to make certain he was quoting a correct price for the heroin to be sold, Thompson left the apartment, went to a bank, and then met appellant—all under the surveillance of two narcotics agents. Upon Thompson's return to the apartment he showed the would-be purchasers two bags that apparently contained heroin. It was reasonable to infer that he got this heroin from appellant. On the next day, in order to check another detail of the sale with his source of supply, Thompson left his potential buyer, agent Robinson, went directly to the building where he had been seen with appellant on the day before, returned, and reported what his source of supply had told him.

Finally, Thompson set up a rendezvous between his source of supply and agent Robinson at 131st Street and Seventh Avenue. Appellant turned up at the appointed place at the appointed time.

This fact alone is an important factor in determining probable cause. Spurlock v. United States, 295 F.2d 387 (9 Cir. 1961), cert. denied, 369 U.S. 877, 82 S.Ct. 1149, 8 L.Ed.2d 280 (1962); see Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

■ ■ By the time of the arrest, which is the crucial moment for determining the existence of probable cause, see Rodgers v. United States, 267 F.2d 79, 88 (9 Cir.1959), Thompson's reliability had been sufficiently corroborated so that the agents had the requisite probable cause to arrest appellant. We hold that appellant's arrest and the search incident thereto were lawful.

We turn to the remaining question raised by this appeal, whether the seizure of the narcotics at 108 West 131st Street was illegal as having been an unreasonable one contrary to the protection afforded householders by the Fourth Amendment. Inasmuch as the agents who seized the narcotics had no search warrant, the validity of the seizure depends upon whether appellant consented to the agents' seizure of the narcotics.

■ ■ The principles which govern us have been well stated in previous opinions. When an accused consents to a search or seizure conducted without a search warrant, the protection he would have enjoyed under the Fourth Amendment is lost to him. United States v. Bianco, 96 F.2d 97 (2 Cir.1938); United States v. Shules, 65 F.2d 780 (2 Cir. 1933). However, an accused's voluntary consent must be proven by clear and positive evidence. A consent is not a voluntary one if it is the product of duress or coercion, actual or implicit. Moreover, to be voluntary, a consent must have been unequivocal, specific, and intelligently given. Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649, 651 (1951); see Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); Karwicki v. United States, 55 F.2d 225, 226 (4 Cir.1932) (per curiam); Kovach v. United States, 53 F.2d 639 (6 Cir.1931) (per curiam); United

States v. Kelih, 272 F. 484, 490–491 (S.D. Ill.1921).

[8] But the case-by-case application of these principles is not always easy. The line between an accused's voluntary consent and his involuntary submission to police authority is often difficult to draw. Though all the cases involving the legality of warrantless searches and seizures are not fully reconcilable, some guidelines are discernible. When a law enforcement officer knocks at the door, identifies himself, and asks to be allowed to search the premises, the acquiescence thus obtained is generally not considered to be voluntary consent. See Judd v. United States, supra; United States v. Marquette, 271 F. 120 (N.D.Cal.1920), appeal dismissed, 270 F. 214 (9 Cir. 1921); United States v. Slusser, 270 F. 818 (S.D.Ohio 1920); United States v. Marra, 40 F.2d 271 (W.D.N.Y.1930). Likewise, if the defendant denies his guilt, asserts that the police will find nothing (perhaps hoping that the contraband is too well concealed for discovery), and "encourages" the officers to search the premises, even then it has been held that there has been no voluntary consent to the ensuing search. See Channel v. United States, 285 F.2d 217 (9 Cir. 1960); Judd v. United States, supra; Higgins v. United States, 93 U.S.App. D.C. 340, 209 F.2d 819 (1954). But see United States v. Adelman, 107 F.2d 497 (2 Cir.1939). In the Higgins case it was stated, 209 F.2d at 820: "[N]o sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered."

■ On the other hand, if the defendant permits a warrantless search of his home or establishment in the mistaken belief that he has nothing there which will incriminate him, it has been held that the search has been voluntarily consented to. United States v. DeVivo, 190 F.Supp. 483 (E.D.N.Y.1961); United States v. Dornblut, 261 F.2d 949 (2 Cir. 1958), cert. denied, 360 U.S. 912, 79 S. Ct. 1298, 3 L.Ed.2d 1262 (1959). Also, if the defendant admits his guilt to the

officer, instead of denying it to him, and then allows a search without a warrant, this strongly implies voluntary consent on his part. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944). Furthermore, the degree of affirmative assistance given to the police by the suspect is often relevant in determining whether consent exists. See United States v. Burgos, 269 F.2d 763 (2 Cir.1959), cert. denied, 362 U.S. 942, 80 S.Ct. 808, 4 L.Ed.2d 771 (1960); United States v. MacLeod, 207 F.2d 853 (7 Cir.1953).

■ In view of these principles and analogous cases, we hold that the evidence supports the finding that appellant voluntarily consented to the seizure of narcotics at 108 West 131st Street. Except for a few minor inconsistencies in testimony, we have no basis for doubting the credibility of the narcotics agents, inasmuch as appellant put in no evidence whatsoever at either the hearing or the trial. Cf. United States v. DeVivo, 190 F.Supp. 483, 484 (E.D.N.Y.1961). The testimony of the officers clearly supports consent by the appellant. The narcotics agents could not have questioned her for more than an hour before she agreed to take them to the spot where the narcotics were kept. There was no evidence that the officers used any coercion in their interrogation, an interrogation conducted in an automobile parked on a city street in the daytime. While the car was so parked at 142nd Street, appellant admitted to having custody of more heroin than that found in her purse when she was arrested. She then agreed to take two agents to this additional heroin. At 108 West 131st Street it was she who produced the suitcase containing the heroin and the key with which to open that suitcase. The officers made no search or seizure while in the apartment beyond the seizure which appellant agreed could be made before she led the officers there.

In this case, therefore, the proven facts demonstrate that the appellant suffered no deprivation of her constitutional right to be secure from unreasonable searches and seizures inasmuch as she gave her consent to the seizure of the heroin in the apartment. As we have shown, she voluntarily admitted to the narcotics agents that she had more narcotics than were on her person at the time of her legal arrest. She was under no compulsion when she led the officers to the place of hiding, and she actively assisted them from that time forward.

The judgment of conviction is affirmed.