STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FRANK ROBERT BINDHAMMER, DEFENDANT-APPEL-LANT.

Argued February 1, 1965—Decided April 12, 1965.

374

[redacted]

*Mr. Walter D. Van Riper* argued the cause for appellant (*Mr. Stephen N. Maskaleris*, attorney and of counsel).

*Mr. Brendan T. Byrne*, Essex County Prosecutor, argued the cause for respondent (*Mr. Peter Murray*, Assistant County Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

JACOBS, J. The defendant was found guilty by an Essex County jury of murder in the first degree with a recommendation of life imprisonment. He appealed to this Court as of right under *R. R.* 1:2–1(c).

On March 29, 1963, at approximately 9:45 P. M., Officer Frank Shannon, a member of the Newark police department, was shot to death with his own revolver. The shooting occurred in the area of Bloomfield Avenue and Fourth Street in Newark. Though there were some conflicts in the testimony, there was sufficient evidence from which the jury could fairly find, not only that the defendant had killed Officer Shannon, but also that the killing was willful, deliberate and premeditated within the provisions of *N. J. S.* 2A:113–2 as properly charged by the trial court. See *State v. DiPaolo,* 34 *N. J.* 279, 295, *cert.* denied, 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed.* 2d 80 (1961); *State v. Ernst,* 32 *N. J.* 567, 579 (1960), *cert.* denied, 364 *U. S.* 943, 81 *S. Ct.* 464, 5 *L. Ed.* 2d 374 (1961).

On March 29th the defendant was driving a 1958 Buick convertible which had been stolen several days earlier. He visited his mother, had some beer and other alcoholic beverages, and spent a good part of the day and the entire evening in the company of his girl friend Marie Del Guercio, who was married and had a child but was living apart from her husband. After having dinner with Marie at her apartment in Paterson, they drove to Newark, first having left the child with a friend of Marie. In Newark they stopped at two bars where the defendant had some drinks of scotch whisky. They returned to the Buick which they had left in a parking lot, the defendant backed out of the lot, drove up Springfield Avenue to Irvington, then on the Garden State Parkway, and then along Central Avenue in Newark, finally cutting across to Bloomfield Avenue. At Bloomfield Avenue and Fourth Street, the defendant sideswiped a parked car and at the next corner he struck two cars which had stopped for a red light. He got out of the Buick and began walking up Bloomfield

Avenue towards Fourth Street. There was conflicting evidence as to the manner of his walk with the State's testimony supporting its assertion that the defendant's appearance and walk were normal. At one point Marie testified that when the defendant got out of the car he was white, "acted like really nothing happened," and said "Get out of the car Marie, come on." At another point she testified that although the defendant did not fall "against anything" he did appear unsteady.

At the time the defendant ran into the cars at Bloomfield and Fourth, Officer Shannon was in a nearby tavern owned by his brother-in-law. He had done some carpentry work there and had not been drinking. He was about to go on duty in an hour and was wearing his police shirt and pants and a beige colored jacket which was open. His police revolver was in his holster. He began following the defendant up Bloomfield Avenue towards Fourth Street and as the defendant turned into Fourth Street the officer called to him. On her direction examination, Marie testified that she heard the officer say, "stop" and when she turned around he said, "stop, I am an officer." On cross examination she testified that she remembered the officer saying, "stop" but did not recall the rest. The officer reached the defendant and a struggle ensued. There were several eyewitnesses who testified and although there were variations in the testimony their basic observations were much the same.

The defendant had managed to knock the officer down and while the defendant was on top a shot was fired striking the officer. At this point several witnesses observed the defendant, standing or slightly bent with the gun in his hand, while the officer was grabbing hold in an effort either to pull himself up or to pull the defendant down. They then saw the defendant fire two shots into the officer at very close range; medical testimony confirmed that these shots were fired from the gun while it was almost in contact with the officer and that the bullets entered the officer's body at a downward angle. An additional shot fired by the defendant from a slightly greater distance also struck the officer. Two further shots not aimed

at the officer were fired by the defendant; one was fired at a witness who was running up to see what was happening and the other was fired at the driver of a bus which had stopped at the corner of Bloomfield and Fourth. The last shot struck and slightly injured a passenger in the bus.

After the shooting, the defendant and Marie fled to an apartment at 520 No. Third Street in Newark where the defendant had recently lived with Marie's uncle. The defendant obtained the key to the apartment and Marie put band-aids on cuts which he had received over his eye and on his chin. He still had Officer Shannon's gun in his hand and he hid it behind a plywood board panel which was in the wall of the bedroom closet and which could easily be removed. The defendant and Marie then went to sleep. This was about 10 P. M. At 3:15 A. M. Detective Dell'Ermo, along with several other Newark police officers, broke into the apartment, arrested the defendant and made a search. The defendant and Marie were taken to Newark police headquarters while a police officer remained at the apartment.

At headquarters, the defendant was questioned for 20 or 25 minutes and shortly thereafter he gave a statement which was taken in question and answer form. The questions were submitted by Assistant Prosecutor Bianchi in the presence of police officers and Mr. Rostoff, a court reporter who first took the defendant's oath that he would tell the truth and then transcribed the questions and answers in regular course. At one point the questioning of the defendant was temporarily discontinued while officers went to the apartment where they located Officer Shannon's gun in the place which the defendant had described to them. The questioning was then resumed and the defendant identified the gun as the one he "took from the officer." After the defendant's statement was concluded he was examined by a police doctor whose examination was completed by 7 A. M. The defendant told the doctor that he had been drinking and was in an automobile accident, that he "was stopped by a policeman," and that he "grabbed his gun" and "shot him." The doctor found him well oriented as

to time, place and situation and that he had suffered some injuries which could have resulted from the accident or the struggle.

At about 8:30 A. M. the defendant was asked whether he would be willing to go back to the scene and reenact the events of the previous night. According to the State's testimony, the defendant said he was willing and thereupon he was taken to the scene and photographed while he pointed to the various locations where the events had occurred. After returning to headquarters, the defendant appeared before a Newark Magistrate for preliminary hearing. That appearance took place at about 12:15 P. M. (March 30, 1963) but the hearing was adjourned when the defendant, in response to an inquiry from the Magistrate, stated that he would retain his own counsel. At the trial, the State offered evidence as to the defendant's statement and his reenactment. The trial court, acting in accordance with the principles expressed in *State v. Smith*, 32 *N. J.* 501, 559–560 (1960), *cert.* denied, 364 *U. S.* 936, 5 *L. Ed. 2d* 367 (1961), conducted a preliminary inquiry as to their voluntariness and at that juncture the defendant did not introduce any witnesses nor testify himself. The trial court found the statement and reenactment to have been voluntary and submitted their credibility and voluntariness to the jury in accordance with the governing rulings of this Court. See *State v. Hodgson*, 44 *N. J.* 151, 161–162 (1965); *State v. Wolf*, 44 *N. J.* 176 (1965).

After the State's case was completed, the defendant produced testimony by several witnesses and he testified on his own behalf. His story was that he had suffered a blackout and could not recall much of what had transpired. He said he did recall that after the accident he heard Marie calling "let's go" or "come on Frank"; that he moved to the wall of a building and "more or less stumbled into a doorway"; that he saw a man with a gun aimed at Marie, believes he jumped towards him, felt he was going down, and felt "another pain alongside" his ear; that the next thing he remembers "was like a dream" and he "was running down the street following

Marie"; that he couldn't catch Marie, later found himself with Marie at the landlord's apartment, asked him for the key, and realized when he was in the apartment bedroom that he had a gun in his hand. He denied the voluntariness of his statement, asserting that he had said to the officers that he had no knowledge of what had occurred but they told him what had happened and that he should repeat it to the Assistant Prosecutor. The defendant acknowledged that during the taking of his statement he freely let the officers know where the gun had been hidden. As he expressed it, when a detective came in and mentioned that Marie had said he was in the closet, "I realized where I had put the gun and I told him where it was." Insofar as the reenactment was concerned, the defendant testified that when he was asked where the happenings occurred, he told the officers he did not know but they nevertheless told him to point to particular spots and he did so.

Defense counsel did not attack the legal sufficiency of the State's evidence at the trial nor does he attack it on appeal. He does, however, advance several points of alleged legal errors which, he contends, necessitate a reversal and a new trial. These points will be dealt with in the order in which they have been presented in counsel's brief, along with such supplemental arguments as are contained in a separate memorandum which the defendant has filed *pro se*. The first point raised by defense counsel asserts that "the search of the apartment in which the defendant was arrested was unauthorized and illegal and the admission into evidence of the gun found as a result of the search constituted error."

When the officers entered the apartment at 3:15 A. M. they had probable cause to believe that Officer Shannon had been feloniously killed and that the killing was done by the defendant Bindhammer. Their arrest of the defendant at that time was clearly legal and, as an incident thereto, the contemporaneous search which they made for the weapon was equally legal. See *State v. Doyle*, 42 *N. J.* 334 (1964); *cf. Preston v. United States*, 376 *U. S.* 364, 84 *S. Ct.* 1881, 11

*L. Ed. 2d* 777 (1964). They continued their search for some time, but it proved fruitless until the defendant himself told the officers at headquarters where he had placed it and thereafter it was quickly located. The record suggests that there were one or more officers at the apartment at all times between the original entry and the location of the gun. On that premise, the search may perhaps be viewed as a continuing one which, though prolonged, was nonetheless reasonable and incidental to the lawful arrest, as the trial judge found here. *Cf. Harris v. United States,* 331 *U. S.* 145, 67 *S. Ct.* 1098, 91 *L. Ed.* 1399 (1947). However, this need not be pursued since the trial judge also found, with ample support in the evidence, that there was a sufficient consent by the defendant. See *United States v. Smith,* 308 *F.* 2d 657 (2 *Cir.* 1962), *cert.* denied 372 *U. S.* 906, 83 *S. Ct.* 717, 9 *L. Ed.* 2d 716 (1963); *United States v. Dornblut,* 261 *F.* 2d 949 (2 *Cir.* 1958), *cert.* denied 360 *U. S.* 912, 79 *S. Ct.* 1298, 3 *L. Ed.* 2d 1262 (1959). While he was being questioned the defendant admitted that he had stolen the car, that he was involved in the accident, that the officer "grabbed" him and told him "to stand still," that he "was scuffling to get the gun away from him," that when he "got the gun away from him another man started across the street" and that at that point "I turned the gun around and just shot." Later when he was asked where the gun was, he described its location, and when asked: "Do you have any objection to our going in the apartment and getting the gun?" he replied "No, not at all, no. That's where that thing is." Still later when asked whether he had any objection to "our going there without a search warrant" he replied in the negative.

 It is clear that when a search has been validly consented to, it may lawfully be made without a search warrant. See *United States v. Page,* 302 *F.* 2d 81 (9 *Cir.* 1962). The consent may be given while in custody, although here the State has a heavier burden of establishing that such consent was given freely, understandingly and unequivocally. See *United States v. Page, supra,* 302 *F.* 2d, at *p.* 83; *cf. Judd*

*v. United States*, 89 *U. S. App. D. C.* 64, 190 *F. 2d* 649 (*D. C. Cir.* 1951). The particular facts in each case will be determinative and while a court will critically view a consent by one in custody who has made no confession, it will more readily accept a consent by a confessing defendant who has told where the incriminating evidence is hidden. See *United States v. Smith, supra*, 308 *F. 2d* 657; *cf. United States v. Mitchell*, 322 *U. S.* 65, 64 *S. Ct.* 896, 88 *L. Ed.* 1140 (1944). In *Smith*, the Second Circuit, in an opinion sustaining the validity of a search by consent, pointed out that "if the defendant admits his guilt to the officer, instead of denying it to him, and then allows a search without a warrant, this strongly implies voluntary consent on his part." 308 *F. 2d*, at *pp.* 663–664.

Here there would appear to be little reason to doubt that the consent was given freely, understandingly and unequivocally. After admitting that he had shot Officer Shannon and had placed the gun in the bedroom closet, the defendant well knew that it would be quickly sought and that he could do nothing to prevent its early seizure. When asked whether he had any objection to the officers going in for the gun without a search warrant, he could have answered in the affirmative, but that would have made no sense even from his own point of view, for he must have known that they could readily and lawfully have obtained whatever formal warrant was needed. At that point he was not merely submitting to paramount authority but was actively cooperating, presumably with the hope that his course might somehow ameliorate his already acknowledged involvement. See *United States v. Smith, supra*, 308 *F. 2d*, at *p.* 664. The trial court found there was a valid consent and there is nothing in the record to justify disturbance of that finding. *Cf. United States v. MacLeod*, 207 *F. 2d* 853 (7 *Cir.* 1953); *Davis, Federal Searches and Seizures* 187–188 (1964).

The second point advanced by defense counsel charges "that it was error to admit into evidence the contents of the unsigned incriminating statement made by the defendant at

police headquarters after his arrest." According to the State's testimony, the defendant began admitting his involvement immediately after the officers had entered the apartment. Thus when he was first asked at the apartment where the gun was, he said repeatedly, "I did it, I did it" and then said he had left the gun on the bed when he went to sleep. When the defendant was brought to headquarters at about 3:45 A. M., Officers Buerle and Leonardis questioned him for a short period during which he referred to the struggle and acknowledged the shooting. While the officers and the defendant were together in the interrogation room at police headquarters, the Assistant Prosecutor came in and asked the defendant whether he would give a statement. The defendant was told that he did not have to give a statement but he said he was willing to do so. At that point the court reporter was asked to set up his stenographic machine. In the presence of the reporter, the defendant was again told that he did not have to give a statement and that, if necessary, his statement could be used against him. He was again asked whether he was willing to give a statement and he again replied that he was. He stated in response to inquiries by the Assistant Prosecutor that he had not been subjected to any violence or threats and that no promises had been made to him. He knew at that time that the State was charging him with murder.

The reporter testified as to the careful manner in which he administered the oath to the defendant and the conversational nature in which the questions were asked and answered. He stated that the questioning began at 5:10 A. M., that all questions and answers were taken down stenographically as given, that no complaints were made by the defendant at any time as to the manner in which he had been treated, that after the defendant had disclosed the whereabouts of the gun at 5:30 A. M., the statement was temporarily interrupted and was resumed at 6:05 A. M., and that the statement was concluded at 6:14 A. M. At the conclusion of the reporter's testimony, the trial court ruled that the statement made by the defendant under oath in the form of answers to the questions sub-

mitted by the Assistant Prosecutor was voluntary and admissible in evidence; it referred to the testimony evidencing the absence of any threat, violence, promise or abusive conduct of any kind, and to the testimony evidencing that the defendant's will had not been overborne and that he had talked freely and understandingly; it pointed to the State's testimony that the defendant had not at any time requested an attorney or the opportunity of seeing any friend or member of his family and also to the evidence that when the defendant was brought before the Magistrate he then first indicated that he would retain an attorney of his own; and finally, it found that the defendant, who at 23 had long been in trouble with the law, had been sufficiently advised that he did not have to give a statement and that if he did it could be used against him.

The finding of voluntariness is attacked by defense counsel on the basis of the evidence bearing on the defendant's intoxication, physical and mental condition, and related factors. Although the testimony as to the defendant's condition at the time of the shooting may be viewed as conflicting, there was no substantial testimony to support the contention that he was not in full control of his faculties at the time he made his statement. Over seven hours had elapsed between the shooting and the beginning of the statement and during that period he had slept for over five hours and had not consumed any alcoholic beverages. He had received some injuries at the time of the accident and the struggle but they did not appear to be serious or of such nature as to impair his ability to understand, determine and express. His narrations were entirely coherent and the doctor who examined him immediately after he concluded his statement found him well oriented as to time, place and situation. Other witnesses for the State, including the police officers, the Assistant Prosecutor and the reporter, gave testimony as to the defendant's appearance and behavior which pointed directly to the same conclusion. We consider the attack to be clearly without foundation; indeed, this Court has held that intoxication of the accused at the

time he confesses affects only the weight of his confession which is admissible so long as he was capable of narrating the past events and his participation in them. See *State v. Wise,* 19 *N. J.* 59, 91 (1955) ; *State v. Johnson,* 23 *N. J. Super.* 304, 307–308 (*App. Div.* 1952) ; Annot., 69 *A. L. R. 2d* 361 (1960). Here there was more than enough evidence as to such capacity in the defendant. The trial court's finding of voluntariness was properly grounded and no reason exists for disturbing it on appeal. See *State v. LaPierre,* 39 *N. J.* 156, 167, *cert.* denied *Bisignano v. New Jersey,* 374 *U. S.* 852, 83 *S. Ct.* 1920, 10 *L. Ed. 2d* 1073 (1963).

█ Defense counsel contends that since the defendant made his statement without having had the advice of an attorney, it was inadmissible under *Escobedo v. Illinois,* 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed. 2d* 977 (1964). *Escobedo* is a far cry from the case at hand. There the accused had been released on a writ of *habeas corpus* obtained by his attorney. He was again picked up at a later date, asked to see his attorney, and was falsely told that his attorney did not want to see him. In fact his attorney had asked and had been denied permission by the police to see him. Without being advised that he was not required to make any statement and without being afforded any opportunity to consult with his lawyer, he was interrogated and his incriminating statement was admitted into evidence at the trial. The Supreme Court, in setting aside his conviction, held that under the circumstances it was obligatory that the accused be permitted to consult with his lawyer. In the case before us the defendant had no attorney and had made no request for one; furthermore, he was advised that he did not have to make a statement and that it could be used against him. In comparable situations we have consistently held *Escobedo* to be inapplicable. See *State v. Hodgson, supra,* 44 *N. J.,* at *pp.* 162–163 ; *State v. Vigliano,* 43 *N. J.* 44, 49–52 (1964) ; *State v. Smith,* 43 *N. J.* 67, 83–84 (1964), *cert.* denied 379 *U. S.* 1005, 85 *S. Ct.* 731, 13 *L. Ed. 2d* 706 (1965).

385

■ Defense counsel challenges the trial court's action in permitting the reporter to read the questions and answers verbatim into the record. At first the State offered the transcript of the defendant's statement as an exhibit which would go to the jury and be in its hands during its deliberations. Since the statement had not been read and signed by the defendant at the time of its taking, the trial court ruled, on the defendant's objection, that it should not be admitted as an exhibit; this was in accord with the actual holding in *State v. Cleveland*, 6 *N. J.* 316, 331 (1951). The trial court stated, however, that the reporter could read the questions and answers into the record and they would thus become testimony as to which the jury would have to rely on its own recollection in the same manner as other oral testimony. This course was in accord with the holding in *State v. Rios*, 17 *N. J.* 572, 600 (1955), where the State did not offer the unsigned transcript as an exhibit but the reporter who had transcribed the confession "testified orally from his shorthand notes." This testimony was held to be competent and admissible. 17 *N. J.*, at *p.* 600. We find wholly impersuasive the contention of defense counsel that the reporter here should have been compelled to testify merely from his memory and should have been permitted to refer to his shorthand notes (or his transcript thereof) only to the extent necessary to refresh his present recollection.

■ Documents may, of course, freely be referred to for the purpose of refreshing or reviving present recollection. See *Zimmer v. Westinghouse Electric Corp.*, 26 *N. J.* 339, 350–351 (1958). Where the recollection was recorded at the time of the event, or when it was fairly fresh in mind (*McCormick, Evidence* § 277, at *p.* 591 (1954)), its record will generally be more accurate and trustworthy than present recollection of "greater or less vividness." 3 *Wigmore, Evidence* § 738, at *p.* 76 (3*d ed.* 1940). If the circumstances are appropriate, the record may become a competent witness within the evidential doctrine referred to as "past recollection recorded," a doctrine long recognized in our State as well as

elsewhere. See *Kazanjian v. Atlas Novelty Co.*, 34 *N. J. Super.* 362, 369–372 (*App. Div.* 1955). Here the circumstances were patently appropriate. See *Hall v. State*, 223 *Md.* 158, 162 *A. 2d* 751 (1960); *Jordan v. People*, 151 *Colo.* 133, 376 *P. 2d* 699 (1962), *cert.* denied 373 *U. S.* 944, 83 *S. Ct.* 1554, 10 *L. Ed. 2d* 699 (1963); *Fields v. State*, 125 *Neb.* 290, 250 *N. W.* 63 (1933); *cf. State v. Polan*, 80 *Ariz.* 129, 293 *P. 2d* 931 (1956); *People v. Vera*, 131 *Cal. App. 2d* 669, 281 *P. 2d* 65 (*D. C. App.* 1955); *State v. Coy*, 140 *Kan.* 284, 36 *P. 2d* 971 (1934).

In *Hall* the defendant's confession was taken in longhand by a detective and in stenographic notes by a court reporter. The detective stated that he could testify with greater accuracy from his notes than from his recollection and the reporter stated that he had no recollection. The detective was permitted virtually to read his notes in evidence and the reporter was permitted to read from his stenographic notes. This action was sustained by the Maryland Court of Appeals which rested on the past recollection recorded doctrine and voiced its approval of Wigmore's position that absence of recall is not a prerequisite to the invocation of that doctrine. 162 *A. 2d*, at *p.* 759; 3 *Wigmore, supra,* § 738. McCormick also rejects the need for any fixed requirement that the witness must first be shown to have no adequate recollection before the record can be used; he refers to such requirement as "highly inexpedient" and points out that early recordation "generally serves the interest of the perpetuation of truth" and that "memoranda of facts, made nearer to the event than later oral testimony, are more reliable than such testimony from later memory." *McCormick, supra,* § 277, at *p.* 593.

In *Jordan* a statement in question and answer form was taken by a reporter and a typewritten copy was offered in evidence. The court refused to permit the introduction of the statement as an exhibit but did permit the reading of it verbatim to the jury. The statement had not been read or signed by the defendant who urged, on appeal, that its reading to the jury constituted reversible error. In holding that there

was no error, the court expressly rejected the contention that the witness must show lack of recollection after he has sought to stimulate his memory, before the writing may be read to the jury; in the course of its opinion it had this to say:

"Here we have an officer who, if present recollection were relied upon, would be trying to relate from memory what the defendant admitted when interrogated shortly after his arrest. When testifying to the admissions made by the accused, accuracy is a desideratum. *People v. Wojahn*, 169 *Cal. App. 2d* 135, 337 *P. 2d* 192. 'No reasonable man could suppose that the exact words could be obtained from a witness' recollection as well as they could be obtained from a transcript * * * checked up by the witness * * *.' *People v. Weinberger*, 239 *N. Y.* 307, 146 *N. E.* 434. In the present case, the exact words contained in the transcript would obviously be more reliable." 376 *P. 2d*, at *p.* 703

In *Fields* the accused made statements before stenographers who took them in shorthand. At the trial the stenographers were permitted to testify by reading their shorthand notes. In holding that this was proper the court pointed out that it was "infinitely more accurate" for the witnesses to testify from their notes than from memory. 250 *N. W.*, at *p.* 65. Similarly here the reporter's testimony from his notes (or his transcript thereof) was infinitely more accurate than if he had attempted to testify from memory. Though the defendant now asserts that his statement was merely the product of what the police officers told him to say, he does not dispute the making of the statement or the faithfulness of its transcription. Since the judicial search is for truth and accuracy it would indeed be self-defeating for a court to compel a reporter to testify from memory rather than from his notes or transcription; and this would be so regardless of the extent of the reporter's present recollection. The trial court's action here in permitting the questions and answers to be read verbatim into the record was clearly sound and the attack on it is unhesitatingly rejected. We note that after the reporter had completed his testimony, defense counsel altered his earlier position and explicitly requested that the statement itself be admitted into evidence as an exhibit. In view of this, the trial court's later admission

of the statement as an exhibit could not be and is not now advanced as any point of error. See *State v. Kaiser*, 74 *N. J. Super.* 257, 273 (*App. Div.*), certif. denied 38 *N. J.* 310 (1962).

The final point advanced by defense counsel charges "that it was error to admit into evidence photographs of the defendant taken at the scene of the crime." The photographs were taken at the reenactment during the morning of March 30th. The trial court considered the reenactment to be in the nature of a confession and, after conducting the required preliminary inquiry, found it to be voluntary and later submitted its voluntariness and credibility to the jury. See *State v. Hodgson, supra*, 44 *N. J.*, at *pp.* 159–162; *State v. Wolf, supra*, 44 *N. J.* 176. At the time the State offered the photographs into evidence, there was no objection, and the trial court then stated that they would be admitted for the limited purpose of aiding the members of the jury in their determination of whether the defendant's reenactment was voluntary. We find no prejudicial error in the trial court's handling of the matter. See *Bagley v. State*, 232 *Md.* 86, 192 *A. 2d* 53 (1963); *State v. Palmer*, 227 *La.* 691, 80 *So. 2d* 374 (1955); *People v. Dabb*, 32 *Cal. 2d* 491, 197 *P. 2d* 1 (1948); Annot., 19 *A. L. R. 2d* 877 (1951).

In *Bagley* the defendant made a written confession and later reenacted the event. He was convicted of murder and, on appeal, he contended that the testimony and photographs bearing on the reenactment were erroneously received in evidence. In rejecting this contention, the court described the reenactment as a second confession governed by the same rules as were applicable to the written confession. It stated that "[s]ince there was evidence that the defendant voluntarily consented to the taking of the photographs, and there was no showing that the lower court abused its discretion, the admission of the photographs will be sustained." 192 *A. 2d*, at *p.* 58. Similarly here the State's evidence, credited by the trial court, was to the effect that after the defendant had made his incriminating statement, he consented to return to

the scene for a reenactment and, while at the scene, consented to the taking of the photographs. The trial court's admission of the photographs was within its discretionary power and we find no sufficient basis for disturbing its action on appeal. *Cf. State v. Wise, supra,* 19 *N. J.,* at *p.* 98.

■ The memorandum filed by the defendant *pro se* contains nothing which would warrant extended discussion. It complains in general terms about evidential rulings which clearly were not prejudicial and did not affect any of the substantial rights of the defendant. See *R. R.* 1:5–1(a). It suggests police brutality though the record contains extensive and uncontradicted testimony that there was no brutality or other abusive conduct on the part of the police. It complains about the evidence relating to the stolen car but we find no error in this connection. The State's position was that the defendant, aware that he was driving a car which had been stolen by him, hurriedly left the scene of the accident and started up Bloomfield Avenue. To show the defendant's state of mind it offered the evidence with respect to the theft of the car. This evidence was not objected to, was properly received, and the jury was instructed that it was to be considered "solely for the purpose of determining the defendant's state of mind at the time of the alleged incident and for no other purpose." See *State v. Sinnott,* 24 *N. J.* 408, 413–414 (1957).

■ The defendant's memorandum acknowledges that "there is no question of the struggle or of the killing," but advances the contention that the killing was not willful, deliberate and premeditated within *N. J. S.* 2A:113–2. Though the testimony relied on by the defendant might have justified a lesser degree, the testimony relied on by the State clearly justified the finding of first degree, for under settled law it is not necessary that any particular period of time elapse between the formation of the purpose to kill and its execution. See *State v. Van Duyne,* 43 *N. J.* 369, 378 (1964). When the defendant left the stolen car he told Marie to get out and keep going. He heard the officer's direction to stop

but nevertheless struggled with him and managed to take his gun away though the officer was bigger and better trained. After the officer was injured, the defendant deliberately fired at him at close range and at a downward angle and, immediately following the shooting, the defendant was sufficiently aware and capable to run to the apartment, obtain the key from the landlord, and hide the gun behind a wall panel which he took down and replaced. The trial court instructed the jury that it was to consider the testimony relating to intoxication, along with the other circumstances, in determining whether the State had carried its burden of establishing beyond reasonable doubt that the defendant had premeditated, deliberated and willfully killed. See *State v. DiPaolo, supra,* 34 *N. J.,* at *p.* 295. The jury could fairly so find from the evidence, as it did, and nothing in the record persuades us that its finding should be disturbed.

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN—6.

*For reversal*—None.